UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

Chapter 11

In re:

Case No. 13-10029-BKC-RAM
Case No. 13-10031-BKC-RAM

ELCOM HOTEL & SPA, LLC and
ELCOM CONDOMINIUM, LLC,

(Jointly Administered)

Debtors.

_____/

10295 COLLINS INVESTMENT, INC., NICHOLAOS
ROKANAS, PENELOPE LASKARIS, GARY
DANIELS, CLAIRE DANIELS, 513 AMREI LLC,
NAIM FARHAT, KINDA FARHAT, HASSAN
ABBASS, JULIA ABBASS, ASHOK KUMAR,
GEORGE J. SCHAFER, LLC, K & k REALTY
ASSOCIATES, LLC, NORMAN GLOWINSKY,
LILIAN GLOWINSKY, JOSEMAR, LLC,
BAL HARBOUR 1017, LLC, KU TRADING, LLC,
LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH
PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC,
EDWARD TAM, TARA HART, NOEL A DA SILVA,
VIMAL M. FONSECA, DENIS TRUPKIN, LINDA
TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC,
MICHAEL A. MURR, 133812 CANADA, INC.,
FRANCIS LEO DOYLE, III, SUN OBH, LLC, TAR
OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC,
UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714
REGENT BAL HARBOUR, LLC, SKY OBH, LLC,
ROSSI REALTY GROUP, PAUL DALMAZIO,
CHRISTINE DALMAZIO, S T BAL HARBOUR, LLC,
MICHAEL KONIG and RAY SMITH,

Ad. No.

(Action Removed from Circuit Court
of the 11th Judicial Circuit in and for
Miami-Dade County, Florida)

Plaintiffs,

v.

THOMAS SULLIVAN, individually, and JORGE
AREVALO, individually,

Defendants.

_____/

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT pursuant to 28 U.S.C. §§ 1441 and 1452, Federal Rule of Bankruptcy Procedure 9027, and the General Order of Reference of the United States District Court for the Southern District of Florida (the "***District Court***"), Defendant Thomas Sullivan (the "***Removing Party***" or "***Sullivan***") hereby files this Notice of Removal which removes all claims asserted against him by Plaintiffs 10295 Collins Investment, Inc., Nicholaos Rokanas, Penelope Laskaris, Gary Daniels, Claire Daniels, 513 Amrei LLC, Naim Farhat, Kinda Farhat, Hassan Abbass, Julia Abbass, Ashok Kumar, George J. Schafer, LLC, K & K Realty Associates, LLC, Norman Glowinsky, Lilian Glowinsky, Josemar, LLC, Bal Harbour 1017, LLC, Ku Trading, LLC, Lewis Schenker, Arline Schenker, Joseph Puglisi, Patricia Puglisi, Tas Prop, LLC, Edward Tam, Tara Hart, Noel A Da Silva, Vimal M. Fonseca, Denis Trupkin, Linda Trupkin, Indulgence At Bal Halbour, LLC, Michael A. Murr, 133812 Canada, Inc., Francis Leo Doyle, III, Sun Obh, LLC, Tar Obh, LLC, Unit# 1113 Regent Bal Harbour, LLC, Unit 1112 Regent Bal Harbour, LLC, Unit# 714 Regent Bal Harbour, LLC, Sky Obh, LLC, Rossi Realty Group, Paul Dalmazio, Christine Dalmazio, S T Bal Harbour, LLC, Michael Konig and Ray Smith (collectively, the "***Plaintiffs***"), in the action pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, captioned *10295 Collins Investment, Inc., et al., v. Thomas Sullivan, et al.,* Case No. 14-2716 CA 04 (the "***State Court Action***"), to the United States Bankruptcy Court for the Southern District of Florida (the "***Bankruptcy Court***"), where the Chapter 11 cases of the estates of Debtors Elcom Hotel & Spa, LLC ("***Elcom Hotel***") and Elcom Condominium, LLC ("***Elcom Condo,***" with Elcom Hotel, the "***Debtors***") are currently pending, and says:

## BACKGROUND

1.      The Debtors each filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Bankruptcy Code in the Bankruptcy Court on January 2, 2013 (the "*Petition Date*"). Elcom Hotel's case number is 13-10029-BKC-RAM, and Elcom Condo's case number is 13-10031-BKC-RAM. The cases are being jointly administered under lead case number 13-10029-BKC-RAM.

2.      All of the Plaintiffs have filed proofs of claim in the Debtors' bankruptcy cases. *See* Claim Nos. 28-1 through 59-1.

3.      On January 15, 2013, the Bankruptcy Court entered an order approving a stipulation among the Associations,[1] the Debtors, Sullivan, and several entities controlled by Sullivan (the "*Stipulation*"). The Stipulation granted the Associations "derivative standing to pursue any claims of the Debtors against the Debtors' affiliates, current and former insiders[.]" Stipulation at 13.

4.      On August 8, 2013, the Associations filed an adversary proceeding styled *10295 Collins Avenue Residential Condominium Association, Inc., et al., v. Elevation Communities, LLC, et al.,* Adv. Case No. 13-01590-BKC-RAM against, among others, Sullivan (the "*Derivative Action*"). The Derivative Action was "being brought by the Associations utilizing such derivative standing." Compl. at ¶ 1.

5.      Pursuant to Section 10.4.1 of the Debtors' Revised First Amended Joint Plaint of Liquidation, and Paragraph JJ(iii) of the Court's Order (I) Confirming Debtors' Revised First Amended Joint Plan of Liquidation of Elcom Hotel & Spa, LC and Elcom Condominium, LLC; (II) Substantively Consolidating Cases; (III) Setting Bar Date for Rejection Damage Claims; and

---

[1]      10295 Collins Avenue Hotel Condominium Association, Inc. (the "*Hotel Association*") and 10295 Collins Avenue Residential Condominium Association, Inc. (the "*Residential Association*"), together the "*Associations*."

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

(IV) Setting Post-Confirmation Status Conference, the right to litigate the Derivative Action was assigned to the Liquidating Trustee.

6.     On January 30, 2014, the Plaintiffs filed the State Court Action. A copy of the Complaint, along with all other process, pleadings, and other papers filed in the State Court Action, is attached as **Composite Exhibit "A."** Sullivan, through undersigned counsel, accepted service of the Complaint as of March 24, 2014. Per the parties' agreement, Sullivan's response to the Complaint is not due until May 23, 2014.

7.     The claims made against Sullivan in the State Court Action include allegations of (i) breach of fiduciary duty, (ii) aiding and abetting breach of fiduciary duty, (ii) gross negligence, and (iv) violation of Section 608.4228, Florida Statutes (the "*Removed Claims*"). Specifically, the Removed Claims purport to state causes of action for alleged damages arising from Sullivan's supposed mismanagement of the Debtors, as well as identical claims against Jorge Arevalo.

8.     The Removed Claims overlap entirely with the claims asserted in the Derivative Action, which were originally brought by the Hotel Association, of which the Plaintiffs are all members. As will be detailed in a motion to dismiss, all of the claims asserted against Sullivan in the State Court Action are actually claims owned by the Debtor that can only be prosecuted by the Liquidating Trustee. The State Court Action is simply the Plaintiffs' improper attempt to prosecute litigation claims owned by the Trustee.

9.     Additionally, the Removed Claims overlap entirely with the claims asserted in the Plaintiffs' proofs of claim, which mirror the claims in the Derivative Action. By filing these proofs of claim, the Plaintiffs have conceded that their claims are against the Debtors' estates, not the individual defendants in the State Court Action.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

10.     As a result, the outcome of the State Court Action arises in and under, is directly related to, and will affect the Debtors' bankruptcy cases.

## PROCEDURE

11.     The procedure for removal of the State Court Action to this Court is outlined by 28 U.S.C. §§ 1441 and 1452, Federal Rule of Bankruptcy Procedure 902, and Southern District of Florida Local Rule 87.2 (the District Court's General Order of Reference), which provides that all notices of removal pursuant to 28 U.S.C. § 1452(a) shall be filed with the Clerk of the Bankruptcy Court for the Division of the District where the civil action is pending and that the removed claim or cause of action shall be assigned as an adversary proceeding in the Bankruptcy Court.

12.     Pursuant to Federal Rule of Bankruptcy Procedure 9027(a)(2), the period for filing a Notice of Removal of a civil action commenced after the filing of a bankruptcy petition does not end until the passage of the shorter of (A) 30 days after receipt of a copy of the initial pleading setting forth the cause of action to be removed, or (B) 30 days after receipt of the summons if the initial pleading has been filed with the court but not served with the summons. Here, this Removal Notice is being filed within 30 days of the March 24, 2014 service of the Complaint on Sullivan.  Accordingly, this Notice of Removal is timely filed.

## JURISDICTION

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334 and §1452, and the District Court's General Order of Reference, all of which collectively state that the District Court has original jurisdiction over all matters "arising in" or "related to" cases under Title 11 of the United States Code (the "***Bankruptcy Code***") and provide for the reference of these matters to this Court.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

14.     Section 1452 of Title 28 provides, in part, that a party may remove any claim or cause of action in a civil action to the district court if it has jurisdiction pursuant to Section 1334 of Title 28.  In turn, Section 1334(b) of Title 28 provides that a bankruptcy court's jurisdiction extends to those civil proceedings that "arise in" or are "related to" a case filed under Bankruptcy Code.  Because the Removed Claims are civil claims that both "arise in" and are "related to" a case filed under the Bankruptcy Code, as further described below, they are properly before this Court.

15.     The Eleventh Circuit, in the seminal *In re Lemco Gyspum, Inc.,* 910 F.2d 784 (11th Cir. 1990) decision, adopted the Third Circuit's test for determining whether a civil proceeding is sufficiently "related to" a bankruptcy to confer federal jurisdiction to the district court:

> 'The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding ***could conceivably have an effect on the estates being administered in bankruptcy. The proceeding need not necessarily be against the debtor or against the debtor's property.***  An action is ***related to*** bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and ***which in any way impacts upon the handling and administration of the bankrupt estate.'***  We join the majority of the circuits that have adopted the Pacor formulation.

*Id.* at 788; *quoting Pacor, Inc. v. Higgins*, 743 F. 2d 984, 994 (3rd Cir. 1984) (emphasis added).[2]

Further, the Eleventh Circuit has extended the *Pacor* test to provide that a bankruptcy court may exercise subject matter jurisdiction over a dispute provided that some nexus exists between the

---

[2]     The Eleventh Circuit further notes, citing *In re Fietz,* 852 F. 2d 455, 457 (9th Cir. 1988), that the Fourth, Fifth, Eighth and ninth Circuits have adopted the *Pacor* test without modification. *See In re Fietz*, 852 F. 2d at 457; *In re Wood*, 825 F. 2d 90, 93 (5th Cir. 1987); *Dogpatch Properties, Inc. v. Dogpatch U.S.A., Inc. (in re Dogpatch U.S.A., Inc.)*, 810 F. 2d 782, 786 (8th Cir. 1987); *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F. 2d 994, 1002 n. 11 (4th Cir.) *cert. denied* 479 U.S. 876 (1986).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

civil proceeding and the bankruptcy case. *In re Munford, Inc.*, 97 F. 3d 449 (11th Cir. 1996); citing *In re Lemco Gypsum, Inc., infra; see also In re Hilsman*, 351 B.R. 09 (Bankr. N.D. Ala. 2006) (counterclaim being prosecuted in state-court action by Chapter 7 trustee to recover damages could conceivably have an effect on bankruptcy estate, in that estate could stand to benefit from the proceeds of action if trustee prevailed, and therefore state-court action was sufficiently "related to" bankruptcy case so as to fall within bankruptcy court's jurisdiction).

16.     The resolution of the Removed Claims will alter the Debtors' rights, liabilities, options, and/or freedom of action. Specifically, these claims are disguised claims owned by the Debtors that overlap entirely with the Derivative Action, which can only be prosecuted by the Liquidating Trustee.

17.     Because the outcome of Removed Claims will affect the property of the Debtors' estate, the value of the Debtors' estate, and benefit or hinder the administration of the bankruptcy case, this is civil action related to a case under Title 11 over which this Court has jurisdiction pursuant to the provisions of 28 U.S.C. § 1334(a).

18.     Thus, the resolution of the Removed Claims, regardless of their ultimate disposition, will directly affect the property and value of the Debtors' estates, therefore justifying the Court's exercise of jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A) and (B), and 1334(b).

## <u>CORE AND NON-CORE POCEEDINGS</u>

19.     In accordance with Bankruptcy Rule 9027, the Removed Claims constitute: (i) core proceedings pursuant to 28 U.S.C. § 157(b)(2) to the extent that (a) the allegations in the State Court Action arise in and relate to the administration of significant assets of the estate, and (b) they are proceedings affecting the allowance or disallowance of claims against the estate; and (ii) non-core proceedings pursuant to 28 U.S.C. § 157(b)(2) to the extent the allegations in the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

State Court Action relate to alleged acts and omissions alleged to have occurred prior to the Petition Date and are otherwise unrelated to the Debtor's bankruptcy case.

20. In addition, a core proceeding includes matter "arising under" and "arising in" bankruptcy cases. *See* 28 U.S.C. § 157(b)(1). Applying this statute, courts have held that allegations involving alleged pre-petition acts and omissions are sufficient to invoke the bankruptcy court's core jurisdiction as "arising in" or "arising under" a case under the Bankruptcy Code pursuant to 28 U.S.C. 157(b)(2)(A) and/or (B).[3] *See In re Charter Communications*, 409 B.R. 649 (Bankr. S.D. N.Y. 2009) (proceeding that was brought by prepetition lender for determination that, prior to commencement of their Chapter 11 cases, debtors had committed noncurable, nonmonetary defaults under prepetition credit facility, which prevented them from reinstating facility as central component of prepackaged Chapter 11 plan, was proceeding over which court could exercise "core" jurisdiction, even though it was state law dispute regarding debtors' alleged prepetition breaches of contract).

## FINAL ORDERS

21. Sullivan consents to the entry of final orders and/or judgments by the Bankruptcy Court, subject to his right to seek a withdrawal of the reference to the United States District Court based upon a potential jury trial demand.

## VENUE

22. Pursuant to 28 U.S.C. §1452, Bankruptcy Rule 9027, and the General Order of Reference, Sullivan must remove this action to the Bankruptcy Court for the district where the civil action is pending. *See In re S & K Air Power of Florida, Inc.,* 166 B.R. 193 (Bankr. S.D. Fla. 1994) (Chapter 7 trustee should have removed state court action to federal district court for

---

[3] Pursuant to 28 U.S.C. § 157(b)(2), core claims "include, but are not limited to – (A) matters concerning the administration of the estate … [and] (B) allowance or disallowance of claims against the estate[.]"

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

the district in which state court action was pending, and then moved for change of venue to district in which state court action was pending, and then moved for change of venue to district in which bankruptcy proceeding was pending); *see also Retirement System of Alabama v. Merril Lynch & Co.,* 209 F.Supp. 2d 1257 (M.D. Ala. 2002); *Myrter v. Dollar Bank, Federal Savings Bank* (*in re Northwood Homes*), 202 B.R. 63 (Bankr. W.D. Penn. 1996); *In re Hendersonville Condominium Homes, Inc.,* 84 B.R. 510 (Bankr. M.D. Tenn. 1988). Here, because the State Court Action originated in the same district and division within which the United States Bankruptcy Court for the Southern District of Florida is located, this is the proper Court to receive this removal.

23.     As required by Bankruptcy Rule 9027(b), written notice of the filing of this Notice of Removal is being served to all parties of interest, and a copy of this Notice of Removal is being filed this day with the Clerk of the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida.

## CONCLUSION

24.     For the reasons stated herein, the Removing Parties request that the Bankruptcy Court accept jurisdiction over the Removed Claims pursuant to this Notice of Removal, subject to the right of the parties to seek a withdrawal of the reference to the United States District Court based upon any potential jury trial demand.

*[Remainder of Page Intentionally Left Blank]*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document has been furnished to the below-named person on April 14, 2014 via Electronic Mail and U.S. Mail.

*Attorney for Plaintiffs:*
Stevan J. Pardo, Esquire
PARDO GAINSBURG, PL
200 Southeast First Street, Suite 700
Miami, Florida 33131
Tel: (305) 358-1001
Fax: (305) 358-2001
Email: spardo@pardogainsburg.com

*Attorneys for Defendant Jorge Arevalo:*
Joseph A. DeMaria, Esquire
Tew Cardenas LLP
Four Seasons Tower
1441 Brickell Avenue
Suite 1500
Miami, Florida 33131
Tel: (305) 536-1112
Fax: (305) 536-1116
Email: jad@tewlaw.com


MELAND RUSSIN & BUDWICK, P.A.
*Attorneys for the Defendant, Thomas Sullivan*
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 375-6090
Facsimile: (305) 358-1221

By: s/Peter D. Russin
    PETER D. RUSSIN
    Florida Bar Number: 765902
    E-Mail: prussin@melandrussin.com
    ERIC OSTROFF
    Florida Bar Number: 10130
    E-Mail: eostroff@melandrussin.com

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3258/3258-51/01419815.DOC.}

# Composite Exhibit "A"

Filing # 9742860 Electronically Filed 01/30/2014 04:34:41 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO. _____

10295 COLLINS INVESTMENT, INC., NICHOLAOS
ROKANAS, PENELOPE LASKARIS, GARY DANIELS,
CLAIRE DANIELS, 513 AMREI LLC, NAIM FARHAT,
KINDA FARHAT, HASSAN ABBASS, JULIA
ABBASS, ASHOK KUMAR, GEORGE J. SCHAFER,
LLC, K & k REALTY ASSOCIATES, LLC, NORMAN
GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC,
BAL HARBOUR 1017, LLC, KU TRADING, LLC,
LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH
PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC,
EDWARD TAR, TARA HART, NOEL A DA SILVA,
VIMAL M. FONSECA, DENIS TRUPKIN, LINDA
TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC,
MICHAEL A. MURR, 133812 CANADA, INC.,
FRANCIS LEO DOYLE, III, SUN OBH, LLC, TAR
OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC,
UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714
REGENT BAL HARBOUR, LLC, SKY OBH, LLC,
ROSSI REALTY GROUP, PAUL DALMAZIO,
CHRISTINE DALMAZIO, S T BALHARBOUR, LLC,
MICHAEL KONIG and RAY SMITH,

       Plaintiffs,

v.

THOMAS SULLIVAN, individually, and JORGE
AREVALO, individually,

       Defendants.

_____/

## COMPLAINT

Plaintiffs, 10295 COLLINS INVESTMENT, INC., NICHOLAOS ROKANAS,

PENELOPE LASKARIS, GARY DANIELS,CLAIRE DANIELS, 513 AMREI LLC, NAIM

FARHAT,KINDA FARHAT, HASSAN ABBASS, JULIA ABBASS, ASHOK KUMAR,

GEORGE J. SCHAFER, LLC, K & k REALTY ASSOCIATES, LLC, NORMAN

GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC, BAL HARBOUR 1017, LLC, KU

TRADING, LLC, LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH PUGLISI, PATRICIA

PUGLISI, TAS PROP, LLC, EDWARD TAM, TARA HART, NOEL A DA SILVA, VIMAL

M. FONSECA, DENIS TRUPKIN, LINDA TRUPKIN, INDULGENCE AT BAL HALBOUR,

LLC, MICHAEL A. MURR, 133812 CANADA, INC.,  FRANCIS LEO DOYLE III, SUN

OBH, LLC, TAR OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC, UNIT 1112

REGENT BAL HARBOUR, LLC, UNIT# 714 REGENT BAL

HARBOUR, LLC, SKY OBH, LLC, ROSSI REALTY GROUP, PAUL DALMAZIO,

CHRISTINE DALMAZIO, S T BALHARBOUR, LLC, MICHAEL KONIG and RAY SMITH,

(collectively, the "RMA Unit Owners"), sue Defendants, Thomas Sullivan and Jorge Arevalo, in

their individual capacities, and state:

### Parties, Jurisdiction, and Venue

1.     This is an action for:

    a)    Breach of fiduciary duty, the damages from which exceed $15,000.00 exclusive of interest, costs, and attorney's fees;

    b)    Aiding and abetting a breach of fiduciary duty, the damages from which exceed $15,000.00 exclusive of interest, costs, and attorney's fees;

    c)    Gross negligence, the damages from which exceed $15,000.00 exclusive of interest, costs, and attorney's fees; and

    d)    Violations of §608.4228, Florida Statutes.

2.     At all times material hereto, JORGE AREVALO, individually, was a foreign citizen with a residence in Miami-Dade County.

2

3.    At all times material hereto, THOMAS SULLIVAN, individually, was a U.S. citizen and a resident of Miami-Dade County.

4.    The RMA UNIT OWNERS are the owners of 40 hotel condominium units located at 10295 Collins Avenue, Bal Harbour Florida, at the property known as One Bal Harbour. The RMA Unit Owners hereby assert claims against principals of Elcom Hotel & Spa, LLC ("Elcom Hotel"), Tom Sullivan and Jorge Arevalo. These claims concern the portion of the rental revenue that was never remitted to the RMA Unit Owners and the malfeasance of Thomas Sullivan and Jorge Arevalo who, as managing members of Elcom Hotel, caused this loss of rents and other damages to the RMA Unit Owners.

5.    Venue is proper in Miami-Dade County pursuant to Fla. Stat. 47.011.

**General Factual Background**

6.    In 2003, Smith Property Holdings Harbour House L.L.C. (the "Original Owner") owned five acres located at 10275 and 10295 Collins Avenue, Bal Harbour, Florida, which later became the "Property," as defined more fully below.

7.    10275 Collins Avenue was already improved with an existing multi-family residential complex that included accessory retail, office, and recreational amenities (the "Residential Project").

8.    On the 10295 Collins Avenue property, the Original Owner proposed to develop a hotel or hotel condominium (the "Hotel Project").

9.    In June, 2003, the Original Owner and the Village of Bal Harbour, Florida entered into a Development Agreement and Declaration of Restrictive Covenants (the "Development Agreement") to build a new planned development on the Hotel Project. The Development Agreement is recorded in Official Records Book 21375, Page 212, and re-recorded August 22,

3

2003 in Official Records Book 21562, Page 3830, of the public records of Miami-Dade County, Florida.

10.     The Development Agreement required that the development of the Hotel Project include a "luxury five-star hotel."

11.     On January 15, 2004, the Original Owner conveyed the Hotel Project to WCI Communities, Inc. ("WCI"). The deed reflecting such conveyance was recorded on January 16, 2004 in Official Records Book 21982, Page 4121, of the public records of Miami-Dade County, Florida.

12.     The conveyance to WCI was expressly subject to the Development Agreement.

13.     The conveyance to WCI was also expressly subject that certain Declaration of Restrictions, Covenants, Easements, and Operating Agreements dated January 15, 2004, and recorded January 16, 2004 in Official Records Book 21982, Page 4126, of the public records of Miami-Dade County, Florida (the "WCI Declaration of Restrictions").

14.     In the WCI Declaration of Restrictions, WCI proposed to develop a community called "One Bal Harbour" that comprised of several lots, including: (a) a Hotel Condominium Lot consisting of 124 Hotel Condominium Units; (b) a Residential Condominium Lot; (c) a Restaurant Lot; (d) a Spa Lot; and (e) a Hotel Lot.[1]

15.     The WCI Declaration of Restrictions expressly bound WCI to the requirements of the Development Agreement in its development of One Bal Harbour.[2]

16.     From 2004 to 2007, WCI built One Bal Harbour as a hotel and residential condominium development.

---

[1]     WCI Declaration of Restrictions, p. 5.
[2]     WCI Declaration of Restrictions, p. 37

4

17.    As a material part of its sales and development program for the Hotel Units, WCI designed a hotel management program wherein the Hotel Owner (which was WCI at that time) signed a Rental Management Agreement ("RMA") with virtually every buyer of a Hotel Unit. (A copy of a standard RMA is attached as **Exhibit "A"**)

18.    In June 2008, WCI filed for bankruptcy and in June 2009 Elcom Hotel acquired the Hotel Lot (and the other portions or "Lots" of One Bal Harbour).

19.    Thus Elcom Hotel became the owner of (i) certain property located on approximately five acres at 10295 Collins Avenue, Bal Harbour, Florida ("One Bal Harbour") described as the "Hotel Lot", "Spa Lot" and "Restaurant Lot" in the Declaration of Covenants, Restrictions, and Easements of 10295 Collins Avenue Tower in the Official Records Book 25985, pages 4506-4659, in the public records of Miami-Dade County ("Tower Declaration").

20.    As indicated above, the RMA Unit Owners are the owners of 40 Hotel Condominium Units.[3]

21.    When it became the new Hotel Owner in June 2009, Elcom Hotel replaced WCI as a party to the RMAs signed with the individual Hotel Unit Owners. As the new owner of the Hotel Lot, Elcom Hotel also became obligated under the Development Agreement to maintain a five-star Hotel.

22.    In general, the purpose of the RMA was to provide a means by which all of the contracting Hotel Unit Owners would have a five-star hotel manager to rent, manage, and maintain their Hotel Units to upscale transient visitors to South Florida for a profit.

23.    The provisions of the RMA demonstrate the intention of the Hotel Owner and the Unit Owners that the Hotel Owner held only bare legal title solely for the purpose of

---

[3] The Hotel comprises 124 Units. The owners of the balance of the Units are not part of this lawsuit.

transmitting such funds to the respective Unit Owners and that the Unit Owners held equitable title to the their share of rents.  The unpaid share of the Unit Owners' rents was, at all times material to this action, the property of the RMA Unit Owners.

24.    The following language in the RMA illustrates that the Hotel Owner had no title or interest in the rents:

a.    Nowhere in the RMA is the Hotel Owner given control or discretion to use the Unit Owner's share or Payment in any manner that is inconsistent with the requirements set forth in the Agreement.

b.    There is no suggestion in the RMA that the Hotel Owner has any legal right of ownership as to the Unit Owners' Units.  (RMA, Recital A)

c.    The RMA did not, however, give the Hotel Owner any control over the Unit Owner's portion of the rents.

d.    Pursuant to the RMAs, a portion of the Hotel Unit rental revenues collected by the Hotel Owner is actually the property of the RMA Hotel Unit Owners and is defined by the RMA as "Unit Owner's Payment." (RMA, Sections 6A and 6C)

e.    The RMA specified how the Hotel Owner and the Hotel Unit Owners would share in the rents collected by Hotel Owner from Hotel guests who rented the Hotel Owners' Units.

f.    The RMA provides for a division of revenue between Hotel Owner and Unit Owner, and a deduction of certain expenses from the Unit Owners' Payment as set forth in specific detail in section 6B of the RMA.

g.    The RMA gives the Hotel Owner no discretion to withhold the Unit Owner's Payment: "The payment made to Unit Owner in respect of rental revenue from

the Unit, if any, *shall* be equal to 100% of the Adjusted Unit Revenue." (RMA, Recital C and Section 6A) (Emphasis added)

h.    The RMA also indicates that income from the Units would not be pooled; rather, each Hotel Unit Owner would receive income or losses attributable to the actual rental of his or her Unit. (RMA, Section 1E)

i.    The RMA requires the Hotel Owner to provide monthly accountings to each Unit Owner and to remit payment quarterly to the Unit Owner: "Within 30 days of the end of each calendar quarter, Hotel Owner *shall* deliver or cause to be delivered to Unit Owner a statement of account and a payment of the portion of the Adjusted Unit Revenue derived from the use of the Unit by Hotel Guests remaining after deduction of the amounts described in clause a of this Section 6 (the "Unit Owner's Payment"). (RMA, Section 6B)

25.    The RMA Unit Owners did not receive the Unit Owner's Payment or their portion of net rental income on a quarterly basis through September 2011. It has been determined – based on documents furnished by the Hotel Owner - that the amount of rental income received by the Hotel Owner exceeds $4.75 million. There has been no proper accounting of any expenses offset against the rental revenue.

26.    The RMA Unit Owners' loss of these rents, and the actions or inactions of the individuals who controlled Elcom Hotel, namely, Thomas Sullivan and Jorge Arevalo, that caused other damages, are the gravamen of the instant Complaint.[4]

---

[4] On September 30, 2011, in a pending State Court action brought by the 10295 Hotel Condominium Association, Inc. against the Hotel Owner at that time, Elcom Hotel, the state court judge issued an order appointing a Receiver (the "Receivership Order"). In the Receivership Order, the State Court found, "To say that the Property is being mismanaged is an extreme understatement. Plaintiffs have provided evidence, beyond a shadow of doubt, of

**Thomas Sullivan's and Jorge Arevalo's Connection to the Missing Rents**

27.     Elcom Hotel, a Florida limited liability company, has as its sole manager Elevation Communities, LLC.

28.     Elevation Communities, LLC ("Elevation"), is a Florida limited liability company. The managers of Elevation are Thomas Sullivan and Jorge Arevalo.

29.     Elevation was, at all material times, the manager of Elcom Hotel.

30.     Thomas Sullivan and Jorge Arevalo, through Elevation, operated, managed, and controlled Elcom Hotel, the entity that owned the Hotel Lot and which was bound by the RMAs with the Unit Owners who participated in the rental program.

31.     Under Sullivan's and Arevalo's management, the portion of the RMA Unit Owners' rents was dissipated and/or misappropriated and the RMA Unit Owners were deprived of their rightful share of the revenues.

32.     As explained in the counts below, Sullivan and Arevalo, both through action and omission, engaged in gross negligence and breach of their fiduciary duties to the RMA Unit Owner to perform their corporate duties in connection with accounting for and remitting to the

---

fraudulent, deliberate, self-dealing by certain principals of the Defendants for the purpose of misappropriating funds." (Receivership Order, ¶B.) The Receivership Order appointed Jorge J. Perez (the "Receiver"), among other things, to take control and manage the day-to-day affairs and operations of the Property. On December 29, 2011, the state court granted the Receiver's motion to employ Berkowitz Dick Pollack & Brant (the "Forensic Accountants") to perform forensic accounting and other general accounting tasks. The motion requested authorization for the Forensic Accountants to conduct a forensic accounting of all of the financial records of the Property, among other things, to determine the extent to which certain parties misappropriated the assets of the Property, and to conduct an analysis of the Property's Rental Program to determine whether participants received amounts owed to them under the rental program. On or about July 26, 2012, the Forensic Accountants issued an extensive 41-page report (with additional exhibits) titled the "Forensic Accounting Report" (the "Forensic Accounting Report").

RMA Unit Owners their respective shares of the rental revenues collected by Elcom Hotel pursuant to the RMAs.

33.    In addition, Sullivan and Arevalo, having no prior hospitality experience whatsoever, operated, managed, and controlled Elcom Hotel in a manner that violated the Development Agreement, Tower Declaration, and RMA which required a five-star hotel operator.

34.    On January 2, 2013, Elcom Hotel filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq* in the United States Bankruptcy Court for the Southern District of Florida, Case Nos. 13010029-RAM and 13-10031-RAM (the "Bankruptcy").

35.    Plan confirmation in bankruptcy occurred on January 24, 2014 [Case No. 13-10029-RAM, ECF No. 758 and Case No. 13-10031-RAM, ECF No. 27]. Most importantly, the Plan did not include any releases to the individual managers of Elcom Hotel, or its affiliate, Elevation Communities, LLC for their pre-bankruptcy actions or inactions, which is the subject of the instant lawsuit.

36.    All conditions precedent to this action have been satisfied, occurred, or otherwise waived.

## COUNT 1
## BREACH OF FIDUCIARY DUTY

37.    Plaintiff reasserts the allegations contained in paragraphs 2 through 36 above as though the same were fully set forth herein.

38.    This is a claim for breach of fiduciary duty, the damages for which exceed Fifteen Thousand ($15,000.00) Dollars, exclusive of interest, costs, and attorney's fees.

39. As stated above, upon Elcom Hotel's acquisition of the Hotel Lot in June 2009, Elcom Hotel, as Hotel Lot Owner, became a party to the RMA with the RMA Unit Owners.

40. As the Hotel Owner, Elcom Hotel had various obligations to the RMA Hotel Unit Owners, including but not limited to the payment of the Unit Owners' share of rents collected pursuant to the RMAs.

41. Thomas Sullivan and Jorge Arevalo were the sole managing members of Elcom Hotel via their managing membership in Elevation Communities, LLC, which, in turn, was the managing member of Elcom Hotel.

42. Thomas Sullivan and Jorge Arevalo, as the sole managing members of Elcom Hotel, owed a fiduciary duty to the RMA Unit Owners.

43. Pursuant to the RMA, Elcom Hotel, as Hotel Owner, occupied the role of property manager, charged with the fiduciary obligation to manage the Hotel Lot and RMA Unit Owners' individual Units by marketing and promoting the rental of the Units, cleaning and maintaining the Units, operating hotel services that benefitted the Hotel and the Units, collecting rental revenue derived from the Units, and accounting for and remitting the Unit Owners' share of the revenues to the Unit Owners and operating the property as a five-star hotel.

44. The Unit Owners, through their entry into the RMAs, reposed trust and confidence in the Hotel Owner, in its capacity as property manager, to perform the aforementioned duties.

45. The Hotel Owner, by acquiring the Property and stepping into the shoes of WCI as the contracting Hotel Owner in the RMAs, undertook and accepted such trust.

46.     The RMA Unit Owners were particularly dependent upon the Hotel Owner because many RMA Unit Owners reside out of state or outside the United States, and therefore, relied completely upon the Hotel Owner to manage the Property as a five-star hotel and collect the rents.

47.     Thomas Sullivan and Jorge Arevalo, as the sole managing members of Elcom Hotel, failed to remit to the RMA Unit Owners' share of rents and failed to operate a five-star hotel.

48.     Thomas Sullivan and Jorge Arevalo breached their duties as managers by failing to operate a five-star hotel and by failing to provide the RMA Unit Owners' share of rents by either directly dissipating the rents or by allowing the rents to be dissipated through a lack of proper oversight and supervision as required by managing members.  Despite the rental of Hotel Units through September 2011, the time until Thomas Sullivan and Jorge Arevalo controlled Elcom Hotel, the RMA Unit Owners received virtually no rental revenues.

49.     Thomas Sullivan and Jorge Arevalo, in failing to operate the Hotel in accordance with minimal standards in the industry for operations  and accounting and in failing to remit payment of millions of dollars of rents to the RMA Unit Owners, engaged in recklessness or acts of omission, in bad faith or in a manner exhibiting wanton and willful disregard of the RMA Unit Owners' property.

50.     Thomas Sullivan and Jorge Arevalo, as the sole managing members of Elcom Hotel, owed a fiduciary duty to the RMA Unit Owners in that the fiduciary duties of principals are extended to the company's creditors once the company becomes insolvent or is in the vicinity of insolvency.

11

51.    Elcom Hotel was insolvent, or in the vicinity of insolvency at all relevant times because Elcom Hotel generally failed to pay its debts as they became due and because its debts were greater than all of its assets at fair valuation.

52.    Thomas Sullivan and Jorge Arevalo, knew that they undercapitalized Elcom Hotel at the time of the inception of the company because the monies invested into Elcom Hotel[5] was used to purchase the Property, leaving little or no funds available for operating expenses and managerial costs.

53.    Thomas Sullivan and Jorge Arevalo, by virtue of their undercapitalization of Elcom Hotel knew that Elcom Hotel was, from the inception of the companies, either insolvent or in the vicinity of insolvency because the company lacked adequate working capital.

54.    Virtually from the time of formation of the company, such undercapitalization left Elcom Hotel unable to meet its contractual and operational obligations.

55.    The undercapitalization also rendered as creditors the RMA Unit Owners, who were owed their share of rents from the first month Elcom Hotel acquired the Property and replaced WCI as Hotel Owner under the RMAs.

56.    Thomas Sullivan and Jorge Arevalo are personally liable to the RMA Unit Owners, whose rental income has been misappropriated or dissipated by Thomas Sullivan and Jorge Arevalo, regardless of whether Thomas Sullivan and Jorge Arevalo derived any personal benefit and even though Thomas Sullivan and Jorge Arevalo acted as agents of Elcom Hotel.

---

[5] Ano, LLC ("Ano"), now known as F9 Properties, LLC, is a New Hampshire limited liability company doing business in Florida. Ano made the purported loan to Elcom Hotel for the purchase of the Property.  Ano is solely owned and controlled by Thomas Sullivan.

57.    Thomas Sullivan and Jorge Arevalo, as the sole managers of Elcom Hotel, were sufficiently involved in the misappropriation or dissipation of the RMA Unit Owners' share of rents to impose personal liability.

58.    Elcom Hotel owed a duty to the RMA Unit Owners, the duty was delegated to Thomas Sullivan and Jorge Arevalo, and these individuals breached that duty of care by their personal conduct.

59.    As a direct and proximate result of Thomas Sullivan's and Jorge Arevalo's actions or inactions, the RMA Unit Owners have suffered compensatory damages, including but not limited to lost rental and diminution in value of units.

60.    Any contention that Thomas Sullivan or Jorge Arevalo was unaware of the dissipation of the RMA Unit Owners' share of rents is untenable because managers have a duty to correct or prevent misconduct and to exercise reasonable diligence in monitoring the corporate affairs of the limited liability company.

WHEREFORE, the RMA Unit Owners demand judgment against Thomas Sullivan and Jorge Arevalo, jointly and severally, in a sum greater than Fifteen Thousand ($15,000.00) Dollars, plus interest, attorney's fees, and court costs.

## COUNT 2
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

61.    Plaintiff reasserts the allegations contained in paragraphs 2 through 36 above as though the same were fully set forth herein.

62.    This is a claim for aiding and abetting breach of a fiduciary duty, the damages for which exceed Fifteen Thousand ($15,000.00) Dollars, exclusive of interest, costs, and attorney's fees.

13

63.     To the extent that either Thomas Sullivan or Jorge Arevalo was the primary actor in the breach of a fiduciary duty committed against the RMA Unit Owners, as alleged above in Count 1, and that the other of these individuals was not a primary actor in the breach a fiduciary duty, such non-primary actor, whether Thomas Sullivan or Jorge Arevalo, aided and abetted the primary actor in the breach of his fiduciary duty.

64.     Thomas Sullivan and Jorge Arevalo each owed a fiduciary duty to the RMA Unit Owners, either because they were managing members of a company that served as a property manager for the RMA Unit Owners or because the RMA Unit Owners were creditors and Elcom Hotel was insolvent or was in the vicinity of insolvency.

65.     Thomas Sullivan and Jorge Arevalo breached their fiduciary duties by failing to pay the RMA Unit Owners' share of rents and by failing to operate the Hotel at a five-star standard.

66.     Thomas Sullivan and Jorge Arevalo, to the extent the either of them was not the primary actor who affirmatively dissipated or misappropriated the RMA Unit Owners' share of rents, provided substantial assistance or encouragement of the wrongdoing by allowing the rents to be dissipated through a lack of proper oversight and supervision as required by managing members.

67.     This substantial assistance or encouragement of the wrongdoing by either Sullivan or Arevalo included:

a.      failing to stop the other manager, whether Sullivan or Arevalo, from dissipating or misappropriating the rents that both individuals, as the sole managing members, had a fiduciary duty to protect for the RMA Unit Owners, since Sullivan and Arevalo were the only ones to police the other;

14

b.      abandoning or evading his fiduciary duty to review pertinent information and financial records involving Elcom Hotel's remittance (or non-remittance) of the RMA Unit Owners' rents held by Elcom Hotel in a fiduciary capacity and ignoring or failing to recognize red flags that would have demonstrated that those monies were being dissipated or misappropriated; and

c.      failing to operate the Hotel and RMA Units at a five-star standard.

68.     Sullivan and/or Arevalo had knowledge of the breach of fiduciary duty by the other as the primary actor of the breach or should have known of the actions of the other based on the managing member's duty to stay abreast of the corporate affairs of the companies.

69.     As a direct and proximate result of Thomas Sullivan's or Jorge Arevalo's aiding and abetting the breach of fiduciary duty of the other, the RMA Unit Owners have suffered damages.

WHEREFORE, the RMA Unit Owners demand judgment against Thomas Sullivan or Jorge Arevalo in a sum greater than Fifteen Thousand ($15,000.00) Dollars, plus interest, attorney's fees, and court costs.

## COUNT 3
## GROSS NEGLIGENCE

70.     Plaintiff reasserts the allegations contained in paragraphs 2 through 36 above as though the same were fully set forth herein.

71.     This is a claim for gross negligence, the damages for which exceed Fifteen Thousand ($15,000.00) Dollars, exclusive of interest, costs, and attorney's fees.

72.     Thomas Sullivan and Jorge Arevalo, as managing members of Elcom Hotel, through their status as managing members of Elevation, which was the sole managing member of Elcom Hotel, willfully, knowingly, consciously, and recklessly, and in bad faith, failed to use

reasonable skill and care to account for and remit to the RMA Unit Owners the rents due and failed to use reasonable skill and care in their operation and management of the Hotel and RMA Units.

73.     By either actively withholding and/or misappropriating the RMA Unit Owners' share of rents, or by consciously disregarding the known or obvious risk that dissipating the RMA Unit Owners' share of rental revenues would result in the loss of such revenues to the RMA Unit Owners, as well as the manner in which they operated the property into the ground until it filed bankruptcy, Thomas Sullivan and Jorge Arevalo exhibited a reckless disregard or indifference to the rights and property of the RMA Unit Owners pursuant to the RMA. Thomas Sullivan and Jorge Arevalo knew or should have known that their affirmative actions or failure to monitor the actions of their companies and to ensure its operations were as a five-star hotel made it highly probably that damage to the RMA Unit Owners would occur.

74.     As a direct and proximate result of Thomas Sullivan's and Jorge Arevalo's gross negligence, the RMA Unit Owners have suffered compensatory damage.

WHEREFORE, the RMA Unit Owners demand judgment against Thomas Sullivan and Jorge Arevalo, jointly and severally, in a sum greater than Fifteen Thousand ($15,000.00) Dollars, plus interest, attorney's fees, and court costs.

## COUNT 4
## VIOLATION OF FLORIDA STATUTE 608.4228

75.     Plaintiff reasserts the allegations contained in paragraphs 2 through 36 above as though the same were fully set forth herein.

76.     This is a claim for a statutory violation, the damages for which exceed Fifteen Thousand ($15,000.00) Dollars, exclusive of interest, costs, and attorney's fees.

77.    Pursuant to §608.4228, Fla. Stat., a managing member may be personally liable for monetary damages to the limited liability company ... or any other person for any statement, vote, decision, or failure to act regarding management or policy decisions by a manager or a managing member, where:

(a) The manager or managing member breached or failed to perform the duties as a manager or managing member; and

(b) The manager's or managing member's breach of, or failure to perform, those duties constitutes the following...:

1.    A violation of the criminal law, unless the manager or managing member had a reasonable cause to believe his or her conduct was lawful or had no reasonable cause to believe such conduct was unlawful ...

2.    A transaction from which the manager or managing member derived an improper personal benefit, either directly or indirectly.

5.    In a proceeding by or in the right of someone other than the limited liability company or a member, recklessness or an act or omission which was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

78.    Thomas Sullivan and Jorge Arevalo, as the sole controlling managing members of Elcom Hotel, violated § 608.4228(1) by illegally misappropriating and/or dissipating the RMA Unit Owners' share of rents.

79.    Thomas Sullivan and Jorge Arevalo, as the sole controlling managing members of Elcom Hotel, violated § 608.4228(2) by improperly deriving a personal benefit from the RMA Unit Owners' share of rents.

80.    Thomas Sullivan and Jorge Arevalo, as the sole controlling managing members of Elcom Hotel, violated § 608.4228(1)(b)(5) by either actively engaging in or failing to prevent the illicit dissipation and/or misappropriation of the RMA Unit Owners' share of rents.

81.    Thomas Sullivan's and Jorge Arevalo's dissipation and/or misappropriation of the RMA Unit Owners' share of rents, or failure to prevent same, was in bad faith, with malicious purpose, and in a manner exhibiting wanton and willful disregard of the RMA Unit Owners' property.

82.    As a direct and proximate result of Thomas Sullivan's and Jorge Arevalo's personal and active violation of § 608.4228, the RMA Unit Owners have been damaged in excess of $15,000 exclusive of interest, costs, and attorney's fees.

WHEREFORE, the RMA Unit Owners demand judgment against Thomas Sullivan and Jorge Arevalo, jointly and severally, in a sum greater than Fifteen Thousand ($15,000.00) Dollars, plus interest, attorney's fees, and court costs.

**JURY TRIAL DEMAND**

The RMA Unit Owners demand a jury trial on all triable issues.

Dated this 30th day of January, 2014.

PARDO GAINSBURG, PL
Attorneys for the RMA Hotel Unit Owners
200 Southeast First Street, Suite 700
Miami, FL 33131
Phone: (305) 358-1001
Facsimile: (305) 358-2001

By: _____
Stevan J. Pardo, Esq.
Florida Bar No. 438626
E-Mail: spardo@pardogainsburg.com

18

## RENTAL MANAGEMENT AGREEMENT

This RENTAL MANAGEMENT AGREEMENT (the "Agreement") is made as of the 3rd day of January, 2005 between WCI COMMUNITIES, INC., a Delaware corporation, its successors and assigns ("Hotel Owner"), and Gary Daniels ("Unit Owner").

### RECITALS:

A.     Unit Owner has acquired ownership of residential unit # 1717 (the "Unit") in the condominium project known as "10295 Collins Avenue, Hotel Condominium" located in the Village of Bal Harbour, Florida (the "Condominium"), which Condominium has been established pursuant to that certain Declaration Of Condominium of 10295 Collins Avenue, Hotel Condominium dated as previously provided to you (the "Condominium Declaration") and that certain Declaration of Covenants, Restrictions and Easements for 10295 Collins Avenue Tower dated as of January 16, 2004 (the "Master Declaration"), recorded in the Public Records of Miami-Dade County, Florida.

B.     The Condominium has been established and created in a building, a portion of which is comprised of a luxury hotel owned by Hotel Owner and to be known as "The Regent Bal Harbour" (the "Hotel").

C.     Hotel Owner or its delegates will manage the Hotel and a voluntary rental program for some of the units within the Condominium (the "Rental Program") for purposes of making units available to third parties for transient lodging as part of the Hotel operation.

D.     Unit Owner desires to make the Unit available for participation in the Rental Program on the terms set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Hotel Owner and Unit Owner hereby agree that the Recitals are incorporated herein by reference and further agree as follows:

1.     UNIT OWNER ACKNOWLEDGMENTS.  UNIT OWNER ACKNOWLEDGES THAT:   (A) NO INDUCEMENTS OR REPRESENTATIONS OF ANY KIND HAVE BEEN MADE DIRECTLY OR INDIRECTLY TO UNIT OWNER BY OR ON BEHALF OF ANY OPERATOR OF THE HOTEL, HOTEL OWNER, ITS AGENTS OR EMPLOYEES AS TO ANY TAX OR OTHER ECONOMIC BENEFITS OR IMPLICATIONS WHICH MAY OR MAY NOT BE REALIZED FROM OWNING AND/OR LEASING THE



EXHIBIT "A"

UNIT AS PART OF THE RENTAL PROGRAM; (B) UNIT OWNER HAS NOT BEEN REQUIRED TO PLACE THE UNIT IN THE RENTAL PROGRAM OR TO RETAIN HOTEL OWNER OR ANY OPERATOR OF THE HOTEL, OR ANY OTHER DESIGNEE OF HOTEL OWNER TO RENT THE UNIT TO THIRD PARTIES, AND UNIT OWNER HAS BEEN FREE TO USE ANY OTHER RENTAL AGENT FOR THAT PURPOSE OR TO LEASE THE UNIT ON UNIT OWNER'S OWN OR TO NOT LEASE THE UNIT AT ALL; (C) NEITHER HOTEL OWNER, NOR ANY OF ITS AGENTS OR EMPLOYEES (INCLUDING ANY OPERATOR OF THE HOTEL) MAKES, OR HAS MADE, ANY GUARANTEES OR REPRESENTATIONS REGARDING RENTAL INCOME WITH RESPECT TO THE RENTAL OF THE UNIT AND/OR THE RENTAL PROGRAM; (D) TO THE EXTENT ANY SALES AGENT OR REPRESENTATIVE OF HOTEL OWNER HAS MADE, SUGGESTED OR PERMITTED AN INFERENCE WITH RESPECT TO, OR IMPLIED ANY PROJECTION OF RATE, OCCUPANCY, PROFIT OR LOSS IN CONNECTION WITH THE RENTAL PROGRAM, SUCH INFORMATION DOES NOT CONSTITUTE A REPRESENTATION OF HOTEL OWNER OR ANY OPERATOR OF THE HOTEL OR ANY OTHER DESIGNEE OF HOTEL OWNER AND HAS NOT BEEN RELIED ON, OR CONSIDERED, BY UNIT OWNER IN MAKING THE DECISION TO ENTER INTO THIS AGREEMENT; (E) INCOME FROM THE RESIDENTIAL UNITS IN THE RENTAL PROGRAM IS NOT AND WILL NOT BE POOLED, AND EACH OWNER OF A RESIDENTIAL UNIT IN THE RENTAL PROGRAM WILL RECEIVE INCOME OR LOSSES (AS APPLICABLE) ATTRIBUTABLE TO THE ACTUAL RENTAL OF HIS OR HER RESIDENTIAL UNIT AS SET FORTH IN THIS AGREEMENT; (F) THERE MAY BE A DELAY BETWEEN THE DATE THE UNIT OWNER ACQUIRES THE UNIT AND THE DATE THE HOTEL OPENS FOR BUSINESS, AND (G) UNIT OWNER HAS BEEN ADVISED TO CONSULT WITH TAX AND LEGAL ADVISORS OF HIS OR HER OWN CHOOSING REGARDING PARTICIPATION IN THE RENTAL PROGRAM.

2.    _Engagement of Hotel Owner_.  Unit Owner hereby engages Hotel Owner and grants to Hotel Owner the exclusive right to rent, manage and control the Unit during the Term (as defined in Section 4 below) pursuant to the terms of this Agreement. Subject to the terms of this Agreement, including, without limitation, Section 9 (pertaining to the Standards), Hotel Owner hereby accepts such engagement. Hotel Owner reserves the right, but shall not be obligated, to retain a third party to perform Hotel Owner's duties pursuant to this Agreement. Such a Hotel operator may, but shall not be required to, be experienced in the operation of luxury class hotels and may or may not be a so called "branded" operator.  To the extent that Hotel Owner retains such a third party operator, such operator may impose standards which shall become the "Standards" for the Hotel as the same are described in Section 9.

3.    _Hotel Owner May Retain an Operator_.  Unit Owner acknowledges and agrees that Hotel Owner may assign or delegate its rights and obligations under this Agreement, in whole or in part, and in Hotel Owner's sole discretion, without notice to or consent from Unit Owner, to (i) the operator of the Hotel from

time to time, if any, (ii) an affiliate of Hotel Owner, (iii) any third party designated by Hotel Owner, or (iv) a successor Hotel Owner. In the event that the agreement by which this Agreement is assigned by Hotel Owner, or pursuant to which the responsibilities of Hotel Owner are delegated shall expire or otherwise terminate such that the assignee or delegate is no longer associated with the Hotel, this Agreement will (at the Hotel Owner's option): (a) terminate upon delivery of notice to Unit Owner, or (b) be assigned to the Hotel Owner, another Hotel operator engaged for the Hotel, or other person or entity designated by Hotel Owner, in which event the Hotel Owner or such other Hotel operator, person or entity will perform the functions of the Hotel Owner hereunder. Unit Owner acknowledges that there is no guarantee that: (i) any agreement for management of the Hotel will remain in place for the stated duration of this Agreement, or (ii) the Hotel, this Agreement or the Rental Program will be managed by any particular Hotel operator or any other operator for the duration of the term of this Agreement.

4.    _Term._ This Agreement shall have a term commencing on the later of the date set forth on the first page of this Agreement or the date Unit Owner takes title to the Unit (but in no event earlier than the opening of the Hotel as determined by Hotel Owner (the "Hotel Opening"), and expiring on the last day of the 4_th_ (fourth) full calendar year following the Hotel Opening (the "Term") (as such Term may be extended as provided in this section, or earlier terminated as otherwise provided in this Agreement). Upon expiration of the Initial Term (the "Initial Term"), the Term shall automatically renew for successive five (5)-year periods (each a "Renewal Term") from and after the expiration of the Initial Term, unless Hotel Owner or Unit Owner gives written notice to the other party of its election not to extend the Term, at least one hundred eighty (180) days prior to the effective date of any Renewal Term. Notwithstanding the foregoing, this Agreement shall remain in full force and effect for any reservations of the Unit that have been confirmed prior to written notice of termination of this Agreement (subject to Hotel Owner's good faith efforts to transfer any such confirmed reservation to another unit in the Rental Program), and Unit Owner specifically agrees to honor this Agreement as to such periods of confirmed occupancy.

6.    _Rental Procedures and Rates._ Hotel Owner shall use good faith efforts to rent the Unit to guests of the Hotel (including, but not limited to, guests with complimentary or promotional use, "Hotel Guests") in accordance with the following provisions:

(a)    _Rental Rates._ Rates for rental of the Unit shall be determined by Hotel Owner in accordance with the rate schedule established by Hotel Owner from time to time in its sole discretion. The rate schedule may be revised by Hotel Owner from time to time without notice to Unit Owner to reflect changes in operating costs and rates of comparable properties, special discounts and other conditions and matters deemed relevant by Hotel Owner.

(b)    Financial Risk.  Hotel Owner does not guarantee that Unit Owner will (i) receive any minimum amount of payments hereunder, or (ii) receive rental income equivalent to that generated by any other unit in the Rental Program, or (iii) receive rental income in excess of assessments and other costs associated with the Unit.

(c)    Rotation System.  Hotel Owner agrees that a reservation system will be maintained through which the reservations for the units in the Rental Program may be processed.  Hotel Owner further agrees to rent the Unit in accordance with a fair rotation system to be established by Hotel Owner in order to ensure that all of the units in the Rental Program are fairly and equitably offered for rental, but taking into account (i) Hotel Guest requests, (ii) factors which differentiate units within the Rental Program, such as size, location, view, type of unit, and other relevant factors, and (iii) a priority rental preference with respect to units complying with access and use requirements imposed by the Americans with Disabilities Act ("ADA Compliant Units"), as described below.  Notwithstanding anything to the contrary set forth in this Agreement, Hotel Owner shall have the right at all times to rent units owned by Hotel Owner and ADA Compliant Units prior to all other units in the Rental Program (including the Unit), whether or not the Hotel Guest using such ADA Compliant Unit has a condition which necessitates occupancy of an ADA Compliant Unit.  Such ADA Compliant Units may be owned by Hotel Owner, an affiliate thereof, or a third party.

(d)    Complimentary Use.  Hotel Owner shall have the right to use the Unit for complimentary purposes in Hotel Owner's discretion.  Hotel Owner shall endeavor to equitably allocate such stays among all units in the Rental Program.  Hotel Owner shall not charge a rental rate for the complimentary usage of the Unit, and no rental income shall be paid to Unit Owner with respect to such use.  In no event will the Unit be used on a complimentary basis for more than seven (7) nights during any fiscal year of the Hotel without the approval of Unit Owner.

(e)    Smoking; Pets.  Unit Owner shall designate on Schedule A of this Agreement whether smoking, pets, both or neither shall be permitted in the Unit.  Such election shall govern the Unit during periods of Owner Occupancy as well as during periods of occupancy by Hotel Guests.

(f)    Hotel Owner has Exclusive Use.  Unit Owner agrees that, during the Term, Unit Owner shall not rent or use the Unit except pursuant to the terms of this Agreement.  Hotel Owner may from time to time establish additional rules and regulations with respect to use of the Unit by Hotel Guests and/or Owner Occupants (as defined in Section 10).

6.    Adjusted Unit Revenues and Deductions; Payments to Unit Owner and Hotel Owner.

4

(a)    Unit Owner's Payment.  The payment made to Unit Owner in respect of rental revenue from the Unit, if any, shall be equal to one hundred (100%) percent of the Adjusted Unit Revenue (as defined below in subsection (b)).

(b)    Adjusted Unit Revenue.  The term "Adjusted Unit Revenue" shall mean and refer to the amount resulting after deducting the following costs and expenses from the gross rental revenues (net of discounts, rebates or credits) collected from the rental of the Unit, but excluding sales, use, occupancy and other similar taxes and Hotel employee gratuities collected in connection therewith ("Gross Unit Revenues");

    i.    Management Fee.  A management fee payable to Hotel Owner for the management of this Agreement and the Rental Program in an amount equal to $30.00 for each night that the Unit is occupied by or rented to a Guest (the "Management Fee").  The parties hereto agree that Hotel Owner may, in its discretion, increase the amount of the Management Fee each year commencing on January 1, 2008, and on every anniversary thereafter (i.e., January 1, 2009, January 1, 2010, etc.) by an amount to be determined by the Hotel Owner in its sole discretion, provided, however, that no single increase shall be more than ten percent (10%) greater than the immediately previous Management Fee charged.

    ii.    Rental Program Expenses.  The "Expense Deduction" as follows:  On an annual or more frequent basis, Hotel Owner shall estimate all expenses of the Hotel with respect to the Rental Program and its facilities, equipment, and personnel, including, without limitation, costs and expenses with respect (but not limited) to the following:  (i) providing daily housekeeping services, consumable guest supplies and other standard Hotel services to Hotel Guests and Owner Occupants, (ii) operating, administrative, accounting/bookkeeping, collection and reporting expenses, including, without limitation, employee costs and expenses, and (iii) charges and fees for reservations, sales and marketing services, other centralized services required by the Hotel Owner or Hotel Operator, credit cards, travel agents and other rental-related commissions, and operating licenses and permits ("Gross Rental Program Expenses").  Hotel Owner shall reasonably allocate a portion of the Gross Rental Program Expenses to the Unit based on the approximate usage of the Unit by the Hotel Guests and Owner Occupants as compared to all other units in the Rental Program, and such allocation shall be the "Expense Deduction".  To the extent the actual costs and expenses are less than or greater than the Expense Deduction, any overpayment shall be returned to Unit Owner, and any underpayment shall be charged to Unit Owner pursuant

to the procedure outlined in subsection (c) below, Hotel Owner reserves the right to adjust the Expense Deduction as appropriate in respect of the actual Gross Rental Program Expenses as reasonably allocated to the Unit or this Agreement.

iii. Other Expenses. Unpaid obligations of Unit Owner for expenses referred to in Section 7, including those more particularly described in Sections 8, 9, and 10.

iv. Tax Withholding. Payments to Unit Owner may be subject to income tax withholding requirements under United States tax laws. Payments made to Unit Owner may be reduced by any applicable withholding taxes required to be withheld and paid under applicable United States tax laws. Unit Owner agrees to provide Hotel Owner a valid Taxpayer Identification Number Certification (IRS Form W-9 or acceptable substitute) or, if Unit Owner is not a U.S. Person (as defined under applicable law), a certification of foreign status on IRS Form W-8BEN, W-8ECI or other applicable IRS form. In the event that Hotel Owner is required by applicable U.S. tax laws to withhold any amounts on account of taxes payable, it shall provide Unit Owner with documentation confirming the amount of taxes withheld, together with all other reporting forms necessary to evidence the payment of such tax amounts.

(c) Reporting to Unit Owner and Payment. Within thirty (30) days of the end of each calendar quarter, Hotel Owner shall deliver or cause to be delivered to Unit Owner a statement of account and a payment of the portion of the Adjusted Unit Revenue derived from the use of the Unit by Hotel Guests remaining after deduction of the amounts described in clause (a) of this Section 6 (the "Unit Owner's Payment"), if any. If such statement of account reflects a negative balance, Unit Owner shall pay such balance to Hotel Owner within ten (10) business days of receipt of such statement. Any excess payments shall be distributed to Unit Owner promptly following delivery of the statement of account.

7. Unit Owner's Obligations for Expenses Attributable to the Unit.

(a) Fixed Expenses. Unit Owner covenants to timely and fully pay the following obligations with respect to its Unit directly to the applicable payee: (i) all assessments and other amounts due pursuant to the Condominium Declaration and the Master Declaration (the "Assessments"); (ii) the Reserve amount and all other fees and charges to Hotel Owner pursuant to Section 9; (iii) all utilities with respect to its Unit to the extent not otherwise included in the Assessments; (iv) real estate and personal property taxes with respect to its Unit; (v) debt service with respect to any mortgage or other financing, or both, of the Unit and its contents; and (vi) all insurance costs with respect to the insurance required to be maintained and obtained pursuant to Section 8 ("Insurance Cost").

(b)    Unit Owner Charges.  Unit Owner also covenants to timely and fully pay and be responsible for the payment of the following amounts to Hotel Owner:  (i) all amounts required to be paid by Unit Owner in this Agreement, or any amounts otherwise advanced or funded on Unit Owner's behalf; (ii) all fees and charges for Hotel Services used during an Owner Occupancy Period but which are not otherwise collected at check-out pursuant to Section 10; and (iii) an "Additional Owner Occupancy Use Charge" relative to each night of "Additional Owner Occupancy", as those terms are defined in Section 10.

(c)    Deduction of Payments.  The payments due under subsections 7(a) and (b) herein may, at the election of Hotel Owner, be deducted from Unit Owner's Payment and applied by Hotel Owner for the purpose for which such payment is required pursuant to this Agreement, so long as Unit Owner is notified of Hotel Owner's election to pay same on Unit Owner's behalf.  Upon request of Hotel Owner, Unit Owner shall deliver to Hotel Owner appropriate evidence of payment of any expenses of the type referred to in subsections 7(a) and (b) herein to the extent such payments are not made by Hotel Owner on Unit Owner's behalf.  Initially, Hotel Owner will deduct from Unit Owner's Payment (to the extent available): (i) all Assessments and pay same to the applicable payee, and (ii) all Reserves pursuant to Section 9, and pay the same to the Hotel.

8.    Condominium Unit Insurance.  At Unit Owner's sole cost and expense, Unit Owner agrees to maintain, with an insurance company acceptable to Hotel Owner, a HO-6 condominium package policy or equivalent.  Such policy shall include liability coverage with limits of not less than $1 million per occurrence and in the annual aggregate, and property insurance covering its personal contents and fixtures within the Unit that the Unit Owner is solely responsible for, including any upgrades installed by Unit Owner or by Hotel Owner pursuant to this Agreement.  The property policy shall be on a so-called "all-risk" or "special risk" form on a 100% replacement cost basis and include deductibles that are usual and customary for similar type risks.

To the extent attainable at a reasonable cost, Unit Owner shall request from its insurer that the above insurance name the Hotel Owner Parties (as defined in Section 13 hereof) as additional insureds and shall contain an endorsement waiving any rights of subrogation against Hotel Owner Parties.

Unit Owner agrees to provide a certificate of insurance evidencing the above coverages prior to the commencement of the Term and all expirations/renewals of such insurance.  The certificate of insurance shall provide notice that the policy is not cancelable or can be materially changed without at least thirty (30) days' prior written notice to the Hotel Owner Parties.  Notwithstanding the foregoing, if Hotel Owner offers insurance packages to units in the Rental Program, Unit Owner agrees to obtain such coverage through Hotel Owner and the costs thereof may be deducted pursuant to Section 7.  The

7

amount of insurance contained in any of the aforementioned insurance coverages shall not be construed to be a limitation of the liability on the part of Unit Owner.

B.    <u>Maintenance of Standards.</u>

(a)    Standards for Unit.  Unit Owner acknowledges and agrees that acceptance of the Unit for inclusion in the Rental Program shall be subject to (i) the Unit (and all furnishings, furniture, finishes and equipment, and operating supplies and equipment therein; collectively the "<u>Furnishings and Supplies</u>") being as of the commencement of the Term, and remaining thereafter throughout the Term, at Unit Owner's sole cost and expense, in compliance with the Standards of the Hotel in effect from time to time as determined in Hotel Owner's sole discretion (the "<u>Standards</u>"), and (ii) the purchase by Unit Owner of an additional operating supplies and equipment package for the Unit containing the additional items listed in the attached <u>Schedule B</u>, which shall meet the specifications set forth in the Standards. Unit Owner agrees that once the Unit is accepted into the Rental Program, there shall be no change to the Unit or the Furnishings and Supplies without the prior written consent of Hotel Owner.

(b)    Maintenance of Standards; Reserve.  Unit Owner agrees that upon being accepted into the Rental Program, the Unit must at all times during the Term be maintained, furnished, finished, supplied and equipped in accordance with the Standards, and that Unit Owner shall be solely responsible for payment of the cost of maintaining the Standards within the Unit (inclusive of all Furnishings and Supplies therein). In furtherance of the foregoing, Unit Owner hereby agrees that Hotel Owner may deduct from the Unit Owner's Payment (and to the extent of insufficient funds from Unit Owner's Payment, Unit Owner shall pay to Hotel Owner) on a monthly basis an amount equal to five percent (5%) of the Gross Unit Revenue for the previous month to fund a reserve account (the "Reserve") for the Unit which shall be applied by Hotel Owner to the costs of maintenance, supply, repair, replacement and refurbishing of the Unit and all Furnishings and Supplies therein, as necessary or appropriate (as determined by Hotel Owner in its sole discretion), to meet the Standards (and including, without limitation, payment of periodic deep cleanings).  To the extent that the amounts in the Reserve account are at any time insufficient to maintain the Unit (inclusive of all Furnishings and Supplies therein) in accordance with the Standards pursuant to this <u>subsection (b)</u>, as determined by Hotel Owner in its sole discretion, then Unit Owner will be notified of the amount of additional funds necessary to correct such deficiencies and Unit Owner shall supply such additional funds to Hotel Owner within ten (10) business days of such notice such that Hotel Owner can correct such deficiencies on Unit Owner's behalf and at Unit Owner's sole cost and expense; provided that, if Unit Owner does not timely provide such funds, Hotel Owner may, in its sole discretion, elect to correct any such deficiency on Unit Owner's behalf and at Unit Owner's cost and expense by deduction of such amounts from current and future Unit Owner's Payment or otherwise billing

8

Unit Owner for same. Hotel Owner reserves the right to adjust the percentage of Gross Unit Revenue applied to the reserve from time to time in order to provide adequate funding of the same.

Unit Owner agrees and understands that the Hotel may charge a fee for performance of the foregoing maintenance, cleaning, supply, repair, replacement and refurbishing services, including, without limitation, a procurement charge for purchasing Furnishings and Supplies for the Unit, a refurbishing fee for the Unit requiring refurbishment or capital improvement, and/or a service fee for coordinating any repairs or scheduled maintenance or cleaning with respect to the Unit or items therein. To the extent that such services and costs are appropriately funded from the Reserve, Hotel Owner shall deduct sufficient funds therefrom for the payment of the applicable services and costs and any remaining balance shall be billed to Unit Owner or deducted from Unit Owner's Payment.

Any replacement Furnishings and Supplies added to the Unit (and paid from the Reserve, from deductions to Unit Owner's Payment or from funds provided by Unit Owner) shall be the property of Unit Owner. All amounts in the Reserve shall be the property of Unit Owner and, subject to Section 11(a) herein, any amounts remaining in the Reserve shall be delivered to Unit Owner at the later to occur of the expiration of the Term or the final Renewal Term, or upon the earlier termination of this Agreement. All proceeds (if any) from the sale of any replaced or obsolete Furnishings and Supplies within the Unit shall be deposited into the Reserve.

(c)    Personal Storage.  Unit Owner shall not store private property in the Unit other than in a locked Unit Owner's closet specifically designated by Hotel Owner for that purpose (if any).  The Hotel Owner Parties shall not be responsible for any private property left in the Unit, and may discard any such private property that is not within the locked Unit Owner's closet (if any) at the end of any Owner Occupancy Period. If applicable, Unit Owner hereby grants Hotel Owner access to the interior of the Unit Owner's closet and shall provide Hotel Owner with a copy of the key to the Unit Owner's closet. Hotel Owner shall be entitled to access the Unit Owner's closet (if any) in its sole discretion to remove and discard any contents that are considered by Hotel Owner as a health or safety hazard or which interfere with the maintenance of the Standards.

(d)    Failure to Comply with Standards.  Unit Owner acknowledges and agrees that the failure of the Unit or any Furnishings and Supplies therein to be in compliance with the Standards at any time during the Term shall be a default by Unit Owner under this Agreement entitling Hotel Owner (in addition to any and all other remedies available to it) to immediately suspend the rental of the Unit and the provision of other services under this Agreement until such time as the foregoing deficiency is cured by Unit Owner to Hotel Owner's satisfaction, and if the same is not so cured within thirty (30) days of written notice to Unit Owner, to terminate this Agreement.

9

10.    <u>Unit Owner Occupancy.</u>

(a)    General.  Occupancy of a Unit shall be afforded to Unit Owner in accordance with the provisions of this <u>Section 10</u>.  Unit Owner shall be entitled to "Basic Owner Occupancy" and "Additional Owner Occupancy", as these terms are defined below.  Notwithstanding anything to the contrary contained in this Agreement, neither Unit Owner nor its guests (in either instance, an "<u>Owner Occupant</u>") may use, occupy or enter the Unit for any period of time without a confirmed reservation obtained in accordance with this <u>Section 10</u> (the duration of such reservation period being an "<u>Owner Occupancy Period</u>" and the use of such Unit by an Owner Occupant being referred to as "<u>Owner Occupancy</u>").  In no event shall Unit Owner accept payment or other consideration for the use of the Unit during an Owner Occupancy Period.

(b)    Reservation Policy.  If Unit Owner desires to schedule an Owner Occupancy Period in the Unit, Unit Owner shall submit a reservation request to Hotel Owner in accordance with this Section.  Hotel Owner will set up a dedicated Unit Owner's reservation telephone number for this purpose, and all Owner Occupancy Period reservation requests received from Unit Owner through such Unit Owner's reservation number will be free of any reservation charges.  Reservations for an Owner Occupancy Period made at least thirty (30) days in advance, with the exception of reservations for Peak Season Usage, as to which reservations must be made ninety (90) days in advance, and Prime Peak Season Usage, as to which reservations must be made one (1) year in advance, shall be accepted by Hotel Owner absent extraordinary circumstances preventing Hotel Owner from accepting such reservation, provided that Unit Owner is in compliance with the material terms of this Agreement.  All other reservations for an Owner Occupancy Period shall be on a space-available basis.

(c)    Use of Other Units.  In the event that Unit Owner's Unit is reserved for Hotel usage during a period in which Unit Owner requests a reservation for Owner Occupancy, Hotel Owner will attempt to move the reservation to another suitable Unit within the Hotel.  In the event that Hotel Owner is unable to relocate such reservation Hotel Owner shall, subject to availability, offer Unit Owner another Unit within the Hotel for such period of Owner Occupancy at the normal rates charged for such a Unit, and such occupancy by Unit Owner shall not be considered Owner Occupancy.

(d)    Basic Owner Occupancy.  Subject to the following sentence, Unit Owner shall be permitted the following Owner Occupancy with respect to each Unit without the requirement that Unit Owner pay an Additional Owner Occupancy Use Charge:  a total of eight (8) weeks of annual usage in any calendar year, of which no more than three (3) weeks thereof may be Peak Season Usage or Prime Peak Season Usage, provided that there is no more than one (1) week of Prime Peak Season Usage in

any period of three (3) calendar years ("Basic Owner Occupancy"). For the purpose of determining the amount of Basic Owner Occupancy used, each Owner Occupancy Period of less than one (1) week shall be deemed to be Owner Occupancy of a full week.

For the purpose of this Agreement:

"Prime Peak Season Usage" shall refer to a period of Owner Occupancy that includes any of the following: Christmas Eve or Christmas Day, New Year's Eve or New Year's Day, President's Day, Easter Sunday or the days of the annual Miami Boat Show. Owner Occupancy that includes any such date shall be deemed to be a full week of Owner Occupancy for the purpose of computing Unit Owner's remaining Base Unit Owner Occupancy.

"Peak Season" shall mean a period commencing November 15 of each year and ending on April 30 of the following year.

"Peak Season Usage" shall mean any Owner Occupancy Period occurring during the Peak Season.

(e)     Additional Owner Occupancy. In addition to Basic Owner Occupancy, Unit Owner may, subject to the reservation policy set forth in subsection (b) of this Section 10, reserve a Unit for such additional Owner Occupancy as it chooses, including, without limitation, Prime Peak Season Usage and Peak Season Usage, provided that Unit Owner will be required to pay an Additional Owner Occupancy Use Charge in connection with each night of such "Additional Owner Occupancy". The Additional Owner Occupancy Use Charge shall be established and adjusted from time to time and published on a periodic basis by Hotel Owner, and shall vary depending on the time of such Owner Occupancy.

(f)     Housekeeping; Other services. During any Owner Occupancy Period, Unit Owner shall be entitled to have daily housekeeping services performed in the Unit. An Owner Occupant may use any other service or amenity provided by Hotel Owner to a unit or otherwise provided at the Hotel or Condominium, including (without limiting) mini bar, internet, telephone, business center, food and beverage and/or room service (the "Hotel Services") during an Owner Occupancy Period. Hotel Owner shall provide such services at normal rates or on such other basis as shall be determined by Hotel Owner from time to time. Owner Occupant shall pay for the foregoing services at the time of check-out.

(g).     Check-in Policy. All Owner Occupants shall be required to check-in and check-out with Hotel Owner at the beginning and at the expiration of each Owner Occupancy Period, and the posting of a credit card at check-in may be required by Hotel Owner in its discretion for payment of Hotel Services incurred during such Owner Occupancy Period.

11

11.    Termination and Default.

(a).    Termination; Notice of Default; Right to Cure.  A non-defaulting party shall have the right to terminate this Agreement if (i) the other party fails to pay an amount due to the non-defaulting party hereunder for a period of five (5) days after the date on which notice of such failure has been given to the defaulting party by the non-defaulting party, or (ii) the other party fails to perform, keep or fulfill any of the material covenants, obligations, or conditions set forth in this Agreement (other than a failure to pay an amount of money due hereunder, which is subject to the preceding clause (i)) and such failure continues for a period of thirty (30) days after receipt by the defaulting party of written notice from the non-defaulting party specifying such failure.

(b)    Use of Unit During Unit Owner Default.  In the event Unit Owner shall be in default hereunder, Hotel Owner may elect (in addition or as an alternative to any other remedies provided for in this Agreement) to suspend the rental of the Unit and the provision of other services under this Agreement, to refrain from accepting reservations for Owner Occupancy and to advise Unit Owner that existing reservations for Owner Occupancy shall be cancelled, all until such time as Unit Owner has cured the default hereunder to Hotel Owner's reasonable satisfaction.

(c)    Possible Termination upon Change in Operator.  Unit Owner also agrees that Hotel Owner may terminate this Agreement at any time immediately upon notice to Unit Owner if any agreement for management of the Hotel terminates or otherwise expires.

(d)    Termination upon Sale of Unit.  This Agreement shall automatically terminate upon the sale or other conveyance or transfer of title (be it voluntary or involuntary) of the Unit from Unit Owner, unless Hotel Owner expressly waives such termination and approves an assignment of this Agreement to the subsequent Unit Owner of the Unit (a "Subsequent Unit Owner").  Unit Owner shall provide Hotel Owner with at least thirty (30) days prior written notice of any proposed sale or other conveyance or transfer of title of the Unit.  In the event that Hotel Owner waives such termination of this Agreement and approves the assignment of this Agreement to the Subsequent Unit Owner, then the amounts then remaining in the Reserve shall not be delivered to Unit Owner and shall be retained by the Hotel (for the benefit of the Subsequent Unit Owner) for use with respect to the Unit in accordance with this Agreement (as assigned to such Subsequent Unit Owner).

(e)    Post Termination Use of Unit.  Notwithstanding any termination of this Agreement, this Agreement shall remain in full force and effect for any Unit reservations that have been confirmed prior to termination of this Agreement (subject to Hotel Owner's right to transfer any such confirmed reservation to

12

another Rental Program Unit, in its sole discretion), and Unit Owner specifically agrees to honor this Agreement as to such periods of confirmed occupancy. The foregoing Unit Owner obligation shall survive termination or expiration of this Agreement.

(f)    Final Accounting.  Within at least thirty (30) days from the termination or expiration of this Agreement, Hotel Owner shall deliver to Unit Owner a final report with respect to any remaining unreported Gross Unit Revenue or payments due to or from Unit Owner, the Reserve account balance and the final Unit Owner's Payment. Hotel Owner shall be entitled to deduct from the final Unit Owner's Payment (prior to delivery of same to Unit Owner) and from any amounts remaining in the Reserve, any and all amounts otherwise due and payable to Hotel Owner pursuant to this Agreement; provided that if the foregoing amounts shall not be sufficient to pay same, Unit Owner shall pay any such difference to Hotel Owner within no more than five (5) days after Unit Owner's receipt of the foregoing final report. The foregoing shall survive termination or expiration of this Agreement.

12.    Set-Off; Advancing Funds.  Unit Owner hereby acknowledges and agrees that in the event that Hotel Owner incurs any charge, fee, cost or expense with respect to the Unit pursuant to this Agreement or otherwise at the request or with the consent of Unit Owner, Hotel Owner shall have the right to deduct such expenditures from Unit Owner's Payment or other funds of Unit Owner that are available to Hotel Owner, such as the Reserve. The foregoing shall survive termination or expiration of this Agreement. In the event that Hotel Owner or any Hotel operator advances funds to fulfill Unit Owner's obligations under this Agreement, the same shall be repaid to the advancing party with interest at an annual rate of interest equal to the lesser of (a) the prime or base rate of interest quoted by Citibank, N.A. plus five percent; or (b) the highest lawful rate.

13.    Indemnity.  The term "Hotel Owner Parties" shall include (without limitation) the Hotel Owner, any operator, manager, licensor, franchisor, contract vendee or service provider to Hotel Owner in connection with the Hotel or Rental Program, and their affiliates and successors, and their respective partners, shareholders, trustees, members, directors, officers, employees and agents, and each and every assignee or other party who may claim to have rights in this Agreement by, through or under the Hotel Owner Parties, and such party's affiliates and, successors, and their respective partners, shareholders, trustees, members, directors, officers, employees and agents. "Liabilities" means claims, demands, civil or criminal actions, suits, proceedings, losses, damages, costs, expenses, penalties, and other liabilities (including, without limitation, all reasonable attorneys' fees, experts' fees, court costs, and other costs incurred in investigating, defending or prosecuting any litigation or proceeding), of any nature, kind or description, whether known or unknown, whether predating this Agreement or not, or whether arising out of contract, tort, strict liability, misrepresentation, or violation of applicable law.  Unit Owner shall indemnify, defend, and hold the Hotel Owner Parties harmless for, from and against, any and all

Liabilities directly or indirectly arising out of, caused by, in connection with, related to, or resulting from (in whole or in part) (i) any maintenance, renovation, replacement, repair, condition, rental, management or operation of the Hotel, the Unit (and all property therein) or the Rental Program, or (ii) the performance of this Agreement by Hotel Owner Parties; except to the extent such Liabilities are caused by the gross negligence or willful misconduct of Hotel Owner during the Term. THE OBLIGATIONS OF UNIT OWNER UNDER THIS SECTION SHALL APPLY TO LIABILITIES EVEN IF SUCH LIABILITIES ARE CAUSED IN WHOLE OR IN PART BY THE SOLE, JOINT, OR CONCURRENT ORDINARY NEGLIGENCE, FAULT OR STRICT LIABILITY OF ANY HOTEL OWNER PARTY, WHETHER OR NOT SUCH SOLE OR CONCURRENT ORDINARY NEGLIGENCE, FAULT, OR STRICT LIABILITY IS ACTIVE OR PASSIVE.

Each party, including the Hotel Owner Parties, (each, a "Releasing Party") hereby releases the other, including the Hotel Owner Parties, (each, a "Released Party") from any liability that the Released Party would, but for this Section, have had to the Releasing Party arising out of or in connection with any accident or occurrence, or casualty to the extent that proceeds are received from insurance being carried by or otherwise covering the Releasing Party, its officers, agents or employees; provided that this release will become inoperative if the provisions of this Section invalidate any insurance maintained by the Releasing Party.

The provisions of this Section shall survive any termination or expiration of this Agreement, whether by lapse of time or otherwise, and shall be binding upon the parties hereto and their respective heirs, successors and assigns.

14.    Unit Owner Acknowledgement.  Unit Owner acknowledges that:

a.    The Hotel is part of a mixed use development that is subject to a governmental requirement that it be a hotel that operates at a "five-star" luxury hotel level (which shall be a level which, at a minimum is consistent with the standards maintained as of June 17, 2008 by Fairmont, Ritz-Carlton, St. Regis, Mandarin Oriental and Four Seasons hotels).

b.    This restriction shall dictate certain decisions that Hotel Owner makes regarding the operation of the Hotel and the Standards.

c.    In the event Unit Owner retains a third party operator to carry out its responsibilities with regard to the operation of the Hotel, the agreement pursuant to which such operator is retained will remove day to day operating responsibility and discretion from Hotel Owner.

15.    Miscellaneous.

14

(a)    Force Majeure.  None of the Hotel Owner Parties shall be liable for, nor shall they be deemed to be in default of their obligations under this Agreement due to, any delay or other inability to perform this Agreement attributable to a force majeure event, including, without limitation fire, earthquake, storm or other casualty; performance of capital improvements adversely affecting a material portion of the income generating areas of the Hotel or any other area material to the operation of the Hotel; strikes, lockouts, or other labor interruptions; war, rebellion, riots, acts of terrorism, or other civil unrest; acts of God or of any government; disruption to local, national or international transport services; epidemics, quarantine or any other public health restrictions or public health advisories; or any other event beyond the parties' reasonable control.

(b)    Modification and Changes.  This Agreement cannot be changed or modified except by another agreement in writing signed by Hotel Owner and Unit Owner.

(c)    Understandings and Agreements.  THIS AGREEMENT CONSTITUTES ALL OF THE UNDERSTANDINGS AND AGREEMENTS OF WHATSOEVER NATURE OR KIND EXISTING BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF.  THIS AGREEMENT SUPERSEDES ALL PRIOR, WHETHER ORAL OR WRITTEN, AGREEMENTS BETWEEN THE PARTIES.

(d)    Headings and Section References.  The article and paragraph headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision of this Agreement.  All references in this Agreement to Sections or subsections shall, unless otherwise noted, refer to the Sections or subsections of this Agreement.

(e)    Cost of Enforcement.  Except as otherwise provided in this Agreement, in any proceeding to enforce this Agreement, to collect damages, or to collect any indemnity provided for herein, the prevailing party shall also be entitled to collect all its costs in such action, including the costs of investigation, settlement, expert witnesses and reasonable attorneys' fees, together with all additional costs incurred in enforcing or collecting any judgment rendered.  The foregoing shall survive termination or expiration of this Agreement.

(f)    Arbitration.  Notwithstanding anything to the contrary in this Agreement, all claims for monetary damages and disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be resolved by final and binding arbitration, before a single arbitrator, under the commercial arbitration rules of the American Arbitration Association in Palm Beach County, Florida.  The arbitrator shall be selected by the parties pursuant to the standards set forth in the next sentence of this

paragraph, and if the parties are unable to reach agreement on selection of the arbitrator within ten (10) days after the notice of arbitration is served, then the arbitrator will be selected by the American Arbitration Association. The Arbitrator shall be a person working for a nationally recognized hospitality industry consulting or accounting firm, and shall have not less than ten (10) years' experience in the area of expertise on which the dispute is based (e.g., with respect to operational matters, experience in the management of hotels of generally the same class and category as the Hotel, as a consultant or otherwise, or, with respect to financial matters, experience in the financial or economic evaluation or appraisal of such first-class hotels as a consultant or otherwise); provided that either party may elect the use of a commercial arbitrator in lieu of the foregoing hospitality industry arbitration, in which event the Arbitrator shall be an American Arbitration Association qualified commercial arbitrator having at least five (5) years' experience in the hospitality industry. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than sixty (60) days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or court proceeding that may arise, and shall not otherwise be disclosed. No arbitrator shall have authority to award any punitive, exemplary, statutory or treble damages or to vary or ignore the terms of this Agreement, and shall be bound by controlling law and the terms of this Agreement. The arbitrator shall NOT have subject matter jurisdiction to decide any issues relating to the statute of limitations or to any request for injunctive relief, and the parties hereby stipulate to stay the arbitration proceeding (without the need of a bond) until any such issues in dispute are resolved. Judgment upon the award rendered by the arbitrator shall be final, binding and conclusive upon the parties and their respective administrators, personal representatives, legal representatives, heirs, successors and permitted assigns, and may be entered in any court of competent jurisdiction. The non-prevailing party in an arbitration proceeding shall pay for all reasonable fees, costs and expenses (including reasonable attorney's fees and expenses) of the other party incurred in connection with the dispute resolution process, along with all arbitrator's and arbitration fees, costs and expenses. This subsection shall survive termination or expiration of this Agreement.

(g)    Governing Law, Jurisdiction and Venue. This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without regard to principles of conflicts of laws. The parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Palm Beach County, Florida. Subject to the subsection (f) above, any permitted civil action, arbitration or legal proceeding with respect to this Agreement shall be brought only in the

courts of record of the State of Florida in Palm Beach County or the United States District Court, Southern District of Florida. Each party consents to the jurisdiction of such Florida court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such Florida court. Service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules. The foregoing shall survive termination or expiration of this Agreement.

(h)    Third Parties.  The provisions of this Agreement are solely for the benefit of the parties hereto and the Hotel Owner Parties, and nothing in this Agreement, express or implied, is intended to confer upon any other person any rights or remedies under or by reason of this Agreement. The foregoing shall survive termination or expiration of this Agreement.

(i)    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be considered an original for all purposes.

(j) .    Successors and Assigns.  The rights and obligations of Hotel Owner may be assigned or delegated pursuant to Section 3 of this Agreement. The rights and obligations of Unit Owner under this Agreement may not be assigned without the prior written consent of Hotel Owner (which may be granted or withheld in Hotel Owner's sole discretion).  The terms, provisions, covenants, agreements, and obligations of this Agreement shall be binding upon and shall inure to the benefit of the permitted successors and assigns of the parties hereto.

(k)    Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provisions shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never been a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

(l)    No Waiver.  No failure of any party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder shall constitute a waiver of any party's right to demand strict compliance with the terms of this Agreement unless otherwise specifically provided in this Agreement.

(m)    Notices.  Whenever any notice, demand, or request is required or permitted under this Agreement, such notice, demand, or request shall be made in writing and shall be given by personal delivery, or sent via overnight delivery service, prepaid courier or facsimile, or deposited in the U.S. mail, registered or certified, return receipt requested, airmail postage prepaid. Any notice, demand, or request

that is served upon any party shall be deemed sufficiently given to, and received by, such party for all purposes under this Agreement, (i) if sent via overnight delivery service, courier or personal delivery, at the time such notice, demand or request is personally delivered, to the address specified by the party to receive such notice, (ii) if sent via U.S. mail, registered or certified, return receipt requested, airmail postage prepaid, five (5) days from the date so deposited in the mail, or (iii) if sent via facsimile, at the time of confirmed receipt by such party. The notification addresses of the parties are specified on the signature page of this Agreement. Each party may change its address on at least ten (10) days' prior written notice to the other party. For purposes of this Agreement, statements, invoices and other correspondence from Hotel Owner relating to the Unit shall not constitute a notice, demand or request and shall be deemed to be sufficiently given to Unit Owner if sent by regular U.S. mail.

(n)    Radon Gas. In accordance with the requirements of Florida Statutes Section 404.056(5), the following notice is given:

RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA.  ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY HEALTH DEPARTMENT.

(o)    Cumulative Remedies.  Except as otherwise provided in this Agreement (including, without limitation, in subsection (p) below) or otherwise set forth in subsection (f) above, the remedies provided in this Agreement are cumulative and not exclusive of the remedies provided by law or in equity. The foregoing shall survive termination or expiration of this Agreement.

(p)    LIMITATION ON REMEDIES. ANYTHING IN THIS AGREEMENT AND ANYTHING AT LAW OR IN EQUITY TO THE CONTRARY NOTWITHSTANDING, IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES (INCLUDING, WITHOUT LIMITATION, ANY ARBITRATION PROCEEDING) ARISING UNDER OR WITH RESPECT TO THIS AGREEMENT OR IN ANY MANNER PERTAINING TO THE HOTEL, THE UNIT, THE RENTAL PROGRAM, ANY CLAIMED BREACH OF FIDUCIARY DUTIES OR TO THE RELATIONSHIP OF THE PARTIES HEREUNDER, EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY (i) AGREES THAT EACH PARTY WILL ONLY CLAIM AND BE ENTITLED TO RECEIVE FROM THE OTHER PARTY HERETO HIS OR HER ACTUAL DAMAGES, AND (ii) WAIVES AND RELEASES ANY RIGHT, POWER OR PRIVILEGE EITHER MAY HAVE TO CLAIM OR RECEIVE FROM THE OTHER PARTY HERETO ANY PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES, OR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES

(INCLUDING, WITHOUT LIMITATION, ANY LOST PROFITS OR EARNINGS), EACH PARTY ACKNOWLEDGING AND AGREEING THAT THE REMEDIES HEREIN PROVIDED, AND OTHER REMEDIES AT LAW AND IN EQUITY, WILL IN ALL CIRCUMSTANCES BE ADEQUATE.  THIS SUBSECTION SHALL SURVIVE TERMINATION OR EXPIRATION OF THIS AGREEMENT.

(q)    Effective Date of Agreement.  Notwithstanding the date in which this Agreement is executed, this Agreement shall not become effective until and unless Unit Owner shall have closed on the purchase of the Unit as evidenced by delivery of the deed therefor to the Unit Owner.

[Signature Page Follows]

19

IN WITNESS WHEREOF, the parties hereto have executed or caused to be executed this Agreement, all as of the day and year first above written.

HOTEL OWNER:

WCI COMMUNITIES, INC., a Delaware corporation

Address:

By: _____

24301 Walden Center Drive

Name: Paul Drummond

Bonita Springs, FL 34134

Title: Division President, East, Central, and Southeast Tower Division

Attention: _____

Facsimile No.: _____

UNIT OWNER:

Address:

6 Twin Creek

Name: Gary Daniels    11/10/05

Berwyn, PA 19312

Attention: _____

Facsimile No.: _____

Telephone No.: 610-325-8222

Soc Sec or Tax I.D. No.: 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

SCHEDULE A
SMOKING AND PETS

Smoking [shall] (shall not) be permitted in the Unit.

Pets [shall] (shall not) be permitted in the Unit.

Unit Owner acknowledges that an election to prohibit smoking or pets in a Unit shall not impose an obligation on Hotel Owner to prevent either smoking or pets within the Unit, it being acknowledged that Hotel Owner will make reasonable efforts to require compliance with this election but that compliance with such restrictions cannot generally be assured.

2

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO. 14-002716 CA 01

10295 COLLINS INVESTMENT, INC., NICHOLAOS
ROKANAS, PENELOPE LASKARIS, GARY DANIELS,
CLAIRE DANIELS, 513 AMREI LLC, NAIM FARHAT,
KINDA FARHAT, HASSAN ABBASS, JULIA
ABBASS, ASHOK KUMAR, GEORGE J. SCHAFER,
LLC, K & k REALTY ASSOCIATES, LLC, NORMAN
GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC,
BAL HARBOUR 1017, LLC, KU TRADING, LLC,
LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH
PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC,
EDWARD TAM, TARA HART, NOEL A DA SILVA,
VIMAL M. FONSECA, DENIS TRUPKIN, LINDA
TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC,
MICHAEL A. MURR, 133812 CANADA, INC.,
FRANCIS LEO DOYLE, III, SUN OBH, LLC, TAR
OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC,
UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714
REGENT BAL HARBOUR, LLC, SKY OBH, LLC,
ROSSI REALTY GROUP, PAUL DALMAZIO,
CHRISTINE DALMAZIO, S T BALHARBOUR, LLC,
MICHAEL KONIG and RAY SMITH,

          Plaintiffs,

v.

THOMAS SULLIVAN, individually, and JORGE
AREVALO, individually,

          Defendants.

_____/

## PLAINTIFFS' AND DEFENDANT SULLIVAN'S AGREED ORDER FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT

Plaintiffs, 10295 COLLINS INVESTMENT, INC., NICHOLAOS

ROKANAS, PENELOPE LASKARIS, GARY DANIELS,CLAIRE DANIELS, 513 AMREI LLC, NAIM

FARHAT,KINDA FARHAT, HASSAN ABBASS, JULIA ABBASS, ASHOK KUMAR,

GEORGE J. SCHAFER, LLC, K & K REALTY ASSOCIATES, LLC, NORMAN GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC, BAL HARBOUR 1017, LLC, KU TRADING, LLC, LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC, EDWARD TAM, TARA HART, NOEL A DA SILVA, VIMAL M. FONSECA, DENIS TRUPKIN, LINDA TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC, MICHAEL A. MURR, 133812 CANADA, INC.,  FRANCIS LEO DOYLE III, SUN OBH, LLC, TAR OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC, UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714 REGENT BAL HARBOUR, LLC, SKY OBH, LLC, ROSSI REALTY GROUP, PAUL DALMAZIO, CHRISTINE DALMAZIO, S T BALHARBOUR, LLC, MICHAEL KONIG and RAY SMITH, (collectively, the "RMA Unit Owners"), and Defendant, THOMAS SULLIVAN, submit this Agreed Order for an extension of time for Defendant SULLIVAN to respond to the Complaint, as follows:

This cause having come before the Court on Plaintiffs RMA UNIT OWNERS' and Defendant SULLIVAN's Agreement regarding SULLIVAN's response to the Complaint and the Court, having reviewed the file being otherwise fully advised in the premises, it is ORDERED and ADJUDGED as follows:

1. Defendant SULLIVAN'S counsel have agreed to accept service of the Complaint on Defendant SULLIVAN'S behalf.  Defendant SULLIVAN shall serve a response to the Complaint within 60 days or no later than Friday, May 23, 2014.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 03/26/14.

BETH BLOOM
CIRCUIT COURT JUDGE

2

```
┌─────────────────────────────────────────────────┐
│    No Further Judicial Action Required on THIS    │
│                    MOTION                         │
│    CLERK TO RECLOSE CASE IF POST                  │
│                  JUDGMENT                         │
└─────────────────────────────────────────────────┘
```

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter. The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

cc:  Stevan J. Pardo, Esq.
Eric Ostroff, Esq.

3

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO. 14-002716 CA 01

10295 COLLINS INVESTMENT, INC., NICHOLAOS
ROKANAS, PENELOPE LASKARIS, GARY DANIELS,
CLAIRE DANIELS, 513 AMREI LLC, NAIM FARHAT,
KINDA FARHAT, HASSAN ABBASS, JULIA
ABBASS, ASHOK KUMAR, GEORGE J. SCHAFER,
LLC, K & k REALTY ASSOCIATES, LLC, NORMAN
GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC,
BAL HARBOUR 1017, LLC, KU TRADING, LLC,
LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH
PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC,
EDWARD TAM, TARA HART, NOEL A DA SILVA,
VIMAL M. FONSECA, DENIS TRUPKIN, LINDA
TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC,
MICHAEL A. MURR, 133812 CANADA, INC.,
FRANCIS LEO DOYLE, III, SUN OBH, LLC, TAR
OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC,
UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714
REGENT BAL HARBOUR, LLC, SKY OBH, LLC,
ROSSI REALTY GROUP, PAUL DALMAZIO,
CHRISTINE DALMAZIO, S T BALHARBOUR, LLC,
MICHAEL KONIG and RAY SMITH,

      Plaintiffs,

v.

THOMAS SULLIVAN, individually, and JORGE
AREVALO, individually,

      Defendants.

_____/

## PLAINTIFFS' REQUEST FOR PRODUCTION TO DEFENDANT SULLIVAN

Plaintiffs, 10295 COLLINS INVESTMENT, INC., NICHOLAOS ROKANAS,

PENELOPE LASKARIS, GARY DANIELS, CLAIRE DANIELS, 513 AMREI LLC, NAIM

FARHAT, KINDA FARHAT, HASSAN ABBASS, JULIA ABBASS, ASHOK KUMAR,

GEORGE J. SCHAFER, LLC, K & K REALTY ASSOCIATES, LLC, NORMAN

GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC, BAL HARBOUR 1017, LLC, KU TRADING, LLC, LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC, EDWARD TAM, TARA HART, NOEL A DA SILVA, VIMAL M. FONSECA, DENIS TRUPKIN, LINDA TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC, MICHAEL A. MURR, 133812 CANADA, INC.,  FRANCIS LEO DOYLE III, SUN OBH, LLC, TAR OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC, UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714 REGENT BAL HARBOUR, LLC, SKY OBH, LLC, ROSSI REALTY GROUP, PAUL DALMAZIO, CHRISTINE DALMAZIO, S T BALHARBOUR, LLC, MICHAEL KONIG and RAY SMITH, (collectively, the "RMA Unit Owners"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, request that Defendant, Thomas Sullivan, within thirty (30) days after service of this Request for Production of Documents ("Request"), provide for inspection and copying, in accordance with the below Definitions and Instructions, at the law offices of Pardo Gainsburg, P.L., 200 Southeast First Street, Suite 700, Miami, Florida 33131, all documents in the possession, custody, or control of Defendant that are responsive to the requests contained below:

**DEFINITIONS**

1.      "Person" means a natural Person, a group of natural Persons acting as individuals, a group of natural Persons acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, a partnership, a joint venture, a government or government agency and/or any other incorporated or unincorporated business, government or social entity or any other entity or group of natural Persons or such entities, singular or plural, male, female, or neuter gender, as the context may require.

2

2.     "Plaintiffs" means the RMA Hotel Unit Owners referenced in the style of this

case, and/or any employees, agents, attorneys, representatives, or other individuals who work

directly or indirectly on their behalf;

3.     "One Bal Harbour" or the "Property" means (i) that certain property located at

10295 Collins Avenue in Bal Harbour, Florida, more particularly described in the Tower

Declaration as the "Hotel Lot," the "Spa Lot," and the "Restaurant Lot" (which include, without

limitation, the certain amenities or portions of the Hotel Lot that were intended to serve, be

enjoyed by, or exist for the benefit of the owner(s) of the Lots, the condominium units, and the

guests of the hotel (the "Shared Facilities")), which Tower Declaration is recorded in Official

records Book 25985 at Page 4506 of the Public Records of Miami-Dade County, Florida; (ii) all

rights under the Plaza Easement Agreement recorded in Official Records Book 21982 at Page

4126 of the Public Records of Miami-Dade County, Florida and all amendments thereto; (iii) all

rights under the Development Agreement and Declaration of Restrictive Covenants recorded in

Official Records Book 21375 at Page 212 of the Public Records of Miami-Dade County, Florida

and all amendments thereto (the Tower Declaration, Plaza Easement Agreement, and

Development Agreement and Declaration of Restrictive Covenants being collectively referred to

hereafter as the "One Bal Harbour Documents").

4.     "Complaint" refers to the pleading entitled Complaint filed in this action.

5.     "Elcom Hotel" refers to Elcom Hotel & Spa, LLC.

6.     "Elcom Condo" refers to Elcom Condominium, LLC.

7.     "Elevation" refers to Elevation Communities, LLC.

8.     "Communication" means any Communication which is between or among two (2)

or more Persons, employees, representatives, or agents of a party.  A Communication includes

any document which is recorded in a party's business records for internal or external corporate use irrespective of whether it is actually communicated to another individual.

9.      "Document" is used in its broadest sense under the Federal Rules of Civil Procedure and includes graphic matter of any kind or nature, whether written, printed, typed, recorded, filed, punched, transcribed, taped, or produced or reproduced by any means. The term "document" includes, but is not limited to, all papers, books, contracts, licenses, inter-office communications, records, Personal notes, cablegrams, telexes, e-mails, electronic data, studies, calendars, diaries, desk calendars, appointment books, agendas, minutes, pamphlets, envelopes, telephone messages, graphs, records of meetings, summaries or records of telephone conversations, voice mails, summaries of records of Personal conversations or interviews, employee notebooks, summaries of records of meetings or conferences, tabulations, analyses, evaluations, projections, work papers, charts, statements, summaries, journals, billing records, and invoices, and all communicative materials of any kind. The term "document" also includes every other means by which information is recorded or transmitted, including, but not limited to, photographs, videotapes, tape recordings, microfilms, punch cards, computer programs, printouts, all recordings made through data processing techniques, and the written information necessary to understand and use such materials. The term "documents" is further defined to mean the original, any drafts, and any non-identical copies (i.e., those bearing notations or marks not found on the original).

10.     "Hotel Owner" means Elcom Hotel, the owner of the Property, including the Hotel Lot.

11.     "RMAs" mean the rental management agreements between either the original Hotel Owner, WCI Communities, Inc. or Elcom Hotel and Plaintiffs.

4

12.    "Rental Income" means the rents or monies collected by the Hotel Owner from Hotel guests pursuant to the RMAs.

13.    "Hotel Operations" means activities involved in the day to day functions of running the business.  Such Hotel Operations include, but are not limited to, daily management, hiring and supervision of employees, repairs, gathering and utilizing proprietary information, marketing, and generally converting materials and labor into goods and services as efficiently as possible in order to balances costs with revenues to maximize the profits.

14.    "Unit" means any individual unit or units in the Hotel Condominium Lot at One Bal Harbour.

15.    "Possession, custody, or control" means a document in your physical custody; or, that you own in whole or in part; or, have a right by contract, statute, or otherwise to use, inspect, examine or copy such document on any terms; or have an understanding, express or implied, that you may use, inspect, examine or copy such document on any terms; or you have, as a practical matter, the ability to use, inspect, examine or copy such document.

16.    The words "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information which might otherwise be construed as to be outside the scope of the request.

17.    "Any" shall be understood to include and encompass "all" and vice-versa.

18.    "Reflecting," "reflect," or any other derivative shall be construed as referring to, responding to, relating to, pertaining to, connected with, comprising, memorializing, commenting on, regarding, discussing, showing, describing, concerning, analyzing and constituting.

5

19.     "Relating to," "related to," or "regarding" shall mean, directly or indirectly, refer to, reflect, mention, describe, pertain to, arise out of, or in connection with or in any way legally, logically, or factually be connected with the matter discussed.

20.     "You" or "Yours" means Thomas Sullivan.

## INSTRUCTIONS

1.     If, in responding to any of these document requests, you encounter any ambiguity in construing either the request or a definition or instruction relevant to it, set forth the matter deemed ambiguous and the construction selected or used in responding to the request.

2.     These document requests are continuing in nature and require you to supplement your response promptly if, at any time prior to or during trial or appeal, you obtain additional or different documents responsive to such requests.

3.     Where documents are requested of you, the request seeks all documents in your possession, custody, or control as well as documents in the possession, custody, or control of your agents, representatives, and, unless privileged, attorneys.

4.     Documents produced in response to this request should be produced as they are kept in the usual course of business or should be organized and labeled to correspond with the categories in the request.

5.     If you are aware of any document otherwise responsive to these requests, which is no longer in your possession, custody, or control, identify the name and title of the author, the name and title of the addressee, the date of the document, the subject matter of the document, the last date on which the document was in your control, the Person(s) or entity, if any, now in control of the document, the reasons for your disposition or release of the document, all Persona

who have knowledge of the circumstances surrounding its disposition, and state what knowledge each such Person has.

6.      To the extent that these requests seek production of either back ups or copies of back ups performed for any Person, computer, computer equipment or computer system, such production should be provided in native format wherever possible. "Native format" refers to the electronic format which such electronically stored information was originally or is normally created, viewed and/or modified. This should include, but not be limited to, information about the software or application that the date was created in, stored in, or was used, or is used to read, write, alter, modify, or in any way change or manipulate the date. Legacy systems that no longer run on newer platforms should initially be restored to their native format, and once imagined to preserve any and all associated metadata, should be produced in a format as close as possible to that of the original. "Metadata" refers to the data about data otherwise referred to as the fingerprint of the document. By way of example and without limitation, metadata typically constitutes information about a particular dataset that describes how, when and by whom it was collected, created, accessed or modified and how it was formatted. Metadata may be hidden or embedded. When a request calls for disclosure of metadata, all fields of metadata should be included. When an original or current software or program cannot easily open or read a file, the data should be provided in a format that reflects the nature of the data, such as ASCII delimited for database records, text-based data for work processing documents, and .TIFF, bitmap or .JPEG for graphically based data. If the software or program is either proprietary or only exists for this data, a copy of that software or program should be supplied.

7.      To the extent that these requests seek production of electronically stored information residing elsewhere other than, or in addition to, on back up copies, such information

7

should be produced in its native format on hard drive or other digital storage media that does not otherwise detract from the original format of the files, or that by default may exclude or somehow alter any metadata associated with said files. The information produced should include any original or existing full file path, file or folder structure, or other source referencing data, and be fully inclusive of all supporting and underlying data, the absence of which would render the information incomplete or unusable. All archived data being produced in response to these requests should be provided with the means to view and export such data.

8.    To the extent that any paper-based source documents responsive to the requests are maintained in digital or electronic format for archival purposes, please provide such documents in both paper and digital or electronic format.

9.    Paper documents that are not otherwise contained, stored, or recoverable by electronic means, should be provided either in paper format, or via a scanned image in a .TIFF format. Colored pages, photographs or other documents among such paper documents that would otherwise loose the color format should be scanned in .JPEG or other standard color format. Large charts, graphs or other oversize documents can be reduced in the scan process to not less than 50% of the original size, or not less than makes them readable.

## PRIVILEGE

Whenever a request calls for the production of a document claimed by you to be privileged, supply sufficient factual detail (privilege log) to enable the Court to determine whether or not such document is entitled to a claim of privilege, including:

a.    the date or dates of the document;

b.    the name and position of each Person who participated in the preparation of the document;

8

c.     the name and position of each Person to whom the document was addressed, and the name of each Person to whom the document, or the contents thereof have been communicated by copy, exhibition, reading, or oral conversation of any kind;

d.     the general subject matter of the document; and

e.     the basis or bases for the claim of privilege.

### TIME FRAME

Unless otherwise stated, the relevant time frame for all Requests is January 1, 2009 through the present day.

### REQUESTS

1.     All Documents or Communications relating to Your ownership and control of ANO, LLC, now known as F9 Investments, LLC, including but not limited to operation agreements and articles of incorporation.

2.     All Documents or Communications evidencing or relating to any monies invested by ANO, LLC, now known as F9 Investments, LLC, into the Property.

3.     Any and all loan documents, loan payments, loan re-payments, and loan disbursements between ANO, LLC and Elcom Hotel, Elcom Condo, or Elevation.

4.     Any Documents or Communications relating in any manner to the payment, non-payment, deferred payment, late payment, or default of any loan between ANO, LLC and Elcom Hotel, Elcom Condo, or Elevation.

5.     Any Documents or Communications relating in any manner to the allocation of monies allegedly loaned by ANO, LLC toward the purchase of the Property and/or any individual Units at the Property and Hotel Operations of the Property.

6.    Any Documents or Communications relating in any manner to the allocation of ANO, LLC's investment in the Property as a loan and/or equity.

7.    Any Documents or Communications relating in any manner to capitalizing the Property so as to pay for management, expenses, and daily operations.

8.    Any Documents or Communications relating in any manner to the formation of Elevation.

9.    Any Documents or Communications relating in any manner to the formation of Elcom Hotel.

10.    Any Documents or Communications relating in any manner to the formation of Elcom Condo.

11.    Any Documents or Communications relating in any manner to the roles, duties and responsibilities, liabilities, or percentage of ownership interests of You and/and Jorge Arevalo at Elevation.

12.    Any Documents or Communications relating in any manner to the roles, duties and responsibilities, liabilities, or percentage of ownership interests of You and Jorge Arevalo or Juan Arevalo at Elcom Hotel.

13.    Any Documents or Communications relating in any manner to the roles, duties and responsibilities, liabilities, or percentage of ownership interests of You and Jorge Arevalo or Juan Arevalo at Elcom Condo.

14.    Any Documents or Communications reflecting or recording any meetings attended by You and Jorge Arevalo regarding Hotel Operations.

15.    Any Documents or Communications reflecting or recording any meetings attended by You and Jorge Arevalo regarding the payment of expenses for the Property.

16.     Any Documents or Communications reflecting or recording any meetings attended by You and Jorge Arevalo or Juan Arevalo regarding the Rental Revenue from the Property.

17.     Any Documents or Communications regarding any vendors or services for the Property.

18.     Any Documents or Communications regarding any accounting or financial records for the Property.

19.     All accounting or financial records for the Property.

20.     Any Documents or Communications relating to the allocation of expenses at the Property.

21.     Any Documents or Communications regarding Hotel Operations, the payment of expenses for the Property, or any vendors or services for the Property.

22.     Any Documents or Communications regarding any request by You to review or to obtain any financial information about the Property

23.     Any Documents or Communications regarding or reflecting any inquiry by You regarding the financial records of the Property.

24.     Any Documents or Communications regarding or reflecting any inquiry by You regarding Hotel Operations, the payment of expenses for the Property, or any vendors or services for the Property.

25.     Any Documents or Communications regarding the allocation of Shared Facilities fees for the Property.

26.     Any Documents or Communications regarding Elcom Hotel's or Elcom Condo's portion of Shared Facilities fees for the Property.

11

27.     Any Documents or Communications regarding the Residential Condominium Unit Owners' or the Hotel Condominium Unit Owners' portion of Shared Facilities fees for the Property.

28.     Any Documents or Communications regarding any payments or nonpayment of any Shared Facilities fees by Elcom Hotel, Elcom Condo, the Residential Condominium Unit Owners or the Hotel Condominium Unit Owners.

29.     Any Documents or Communications regarding any accounting or recordation of the payment of any Shared Facilities fees.

30.     Any Documents or Communications regarding any budgets for the Shared Facilities fees/expenses.

31.     Any Documents or Communications regarding any aspect of the Shared Facilities reserves.

32.     Any Documents or Communications regarding any assessments imposed on the Residential Condominium Unit Owners or the Hotel Condominium Unit Owners at One Bal Harbour.

33.     Any Documents or Communications regarding or relating in any manner to Premium Assignment Corp.

34.     Any Documents or Communications regarding any insurance policies, insuring agreements, or insurance financing agreements for One Bal Harbour.

35.     Any Documents or Communications regarding any insurance premiums or bills relating in any way to insurance for One Bal Harbour.

36.     Any Documents or Communications regarding the payment of any monies and/or premiums for insurance for One Bal Harbour.

12

37.    Any Documents or Communications between You and Jorge Arevalo regarding in any manner to the procurement of insurance, insurance premiums, payment of insurance premiums, or financing in connection with any insurance for One Bal Harbour.

38.    Any Documents or Communications between You and JYM, Ltd., JYM General Partner, LLC, One Luxury Management, LLC, One Hotels, LLC, Elevation, or Elcom Hotel, or any of the foregoing entities' employees, agents, or representatives, relating in any manner to the procurement of insurance, insurance premiums, payment of insurance premiums, or financing in connection with any insurance for One Bal Harbour.

39.    Any Documents or Communications regarding any disbursements or payment of monies by Elevation, Elcom Hotel, Elcom Condo, JYM, Ltd., JYM General Partner, LLC, One Luxury Management, LLC, One Hotels, LLC to You.

40.    Any Documents or Communications regarding any disbursements or payment of monies by Elevation, Elcom Hotel, Elcom Condo, JYM, Ltd., JYM General Partner, LLC, One Luxury Management, LLC, One Hotels, LLC to ANO, LLC.

41.    Any Documents or Communications regarding the accounts containing the Rental Revenue.

42.    Any Documents or Communications between You and Jorge Arevalo or Juan Arevalo regarding any aspect of the Rental Revenue.

43.    Any Documents or Communications regarding the escrow or separation of accounting for the Rental Revenue.

44.    Any Documents or Communications regarding the rotation system at the Property.

13

45.    Any Documents or Communications regarding the bouncing of any checks issued by One Bal Harbour.

46.    Any Documents or Communications regarding the charges or payment of management fees by any of the RMA Unit Owners.

47.    Any Documents or Communications regarding reserve requirements for the Rental Revenue.

48.    Any Documents or Communications regarding any inquiry that You made about any aspect of the Rental Revenue.

49.    Any Documents or Communications between You and Gail Beregovich or Themis Michalakos regarding the Rental Revenue.

50.    Any Documents or Communications between You and Gail Beregovich or Themis Michalakos regarding the finances of the Property.

51.    Any Documents or Communications between You and any other Person, including but not limited to Jorge Arevalo, in which You request any information regarding any lawsuits filed against Elcom Hotel or Elcom Condo.

52.    Any Documents or Communications regarding any lawsuits filed against Elcom Hotel or Elcom Condo.

53.    Any Documents or Communications regarding or reflecting the content of any meetings attended by You and Jorge Arevalo or Juan Arevalo regarding the Property.

54.    Any Documents or Communications regarding or reflecting the scheduling of any meetings attended by You and Jorge Arevalo or Juan Arevalo about the Property.

55.    Any Documents or Communications between any Elcom representative and Your accountant(s) or the accountant(s) of any of Your companies.

14

56.    Any Documents or Communications between You and Mark Pordes in connection with any aspect of the One Bal Harbour Property.

57.    Any Documents or Communications relating in any manner to the collection of the Rental Revenue.

58.    Any Documents or Communications relating in any manner to the payment or nonpayment of the Rental Revenue to the RMA Unit Owners.

59.    Any Documents or Communications between You and any other Person, including but not limited to Jorge Arevalo or Juan Arevalo, relating in any manner to the use, expenditure, allocation, or transfer of the Rental Revenue.

60.    Any Documents or Communications relating in any manner to the accounting or recordation of the Rental Revenue.

61.    Any Documents or Communications relating to the Hotel Lot expenses, defined as the "Expense Deduction" by the RMA.

62.    Any Documents or Communications relating to the "Management Fee," as defined by the RMA.

63.    Any and all corporate books and records, including, but not limited to, Articles of Organization, Operating Agreement, Shareholders' Agreement, or any other agreement between You and Jorge Arevalo related to the ownership or operation of Elevation.

64.    Any and all corporate books and records, including, but not limited to, Articles of Organization, Operating Agreement, Shareholders' Agreement, or any other agreement between You and Jorge Arevalo related to the ownership or operation of Elcom Hotel.

65.    Any and all corporate books and records, including, but not limited to, Articles of Organization, Operating Agreement, Shareholders' Agreement, or any other agreement between

You and Jorge Arevalo related to the ownership or operation of Elcom Condo.

66.    All Communications or Documents reflecting communication between You and the department heads, general managers, individuals, employees, or agents of Elcom Hotel, Elcom Condo, Elevation,  JYM, Ltd., JYM General Partner, LLC, One Luxury Management, LLC, or One Hotels, LLC regarding any aspect of the Rental Revenue.

67.    All Communications or Documents that support or tend to support each of Your affirmative defenses in Your response to the Complaint.

68.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #12.

69.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #13.

70.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #14.

71.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #15.

72.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #16.

73.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #17.

74.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #18.

75.    Any and all Communications or Documents that support or tend to support any requests You made for information as set forth in Your response to Interrogatory #19.

76.     Any and all Communications or Documents that support or tend to support Your follow-up efforts as set forth in Your response to Interrogatory #24.

                                    **PARDO GAINSBURG, PL**
                                    Attorneys for the RMA Hotel Unit Owners
                                    200 Southeast First Street, Suite 700
                                    Miami, FL 33131
                                    Phone: (305) 358-1001
                                    Facsimile: (305) 358-2001

                    By: _____
                                    Stevan J. Pardo, Esq.
                                    Florida Bar No. 438626
                                    E-Mail: spardo@pardogainsburg.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing court papers was served via email on the 26th day of March, 2014, to: Eric Ostroff, Esq., Meland Russin Budwick, 3200 Southeast Financial Center, 200 South Biscayne Blvd., Miami, Florida 33131, eostroff@melandrussin.com.

                    By: _____
                                    Stevan J. Pardo
                                    Fla. Bar No. 438616

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO. 14-002716 CA 01

10295 COLLINS INVESTMENT, INC., NICHOLAOS
ROKANAS, PENELOPE LASKARIS, GARY DANIELS,
CLAIRE DANIELS, 513 AMREI LLC, NAIM FARHAT,
KINDA FARHAT, HASSAN ABBASS, JULIA
ABBASS, ASHOK KUMAR, GEORGE J. SCHAFER,
LLC, K & k REALTY ASSOCIATES, LLC, NORMAN
GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC,
BAL HARBOUR 1017, LLC, KU TRADING, LLC,
LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH
PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC,
EDWARD TAM, TARA HART, NOEL A DA SILVA,
VIMAL M. FONSECA, DENIS TRUPKIN, LINDA
TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC,
MICHAEL A. MURR, 133812 CANADA, INC.,
FRANCIS LEO DOYLE, III, SUN OBH, LLC, TAR
OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC,
UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714
REGENT BAL HARBOUR, LLC, SKY OBH, LLC,
ROSSI REALTY GROUP, PAUL DALMAZIO,
CHRISTINE DALMAZIO, S T BALHARBOUR, LLC,
MICHAEL KONIG and RAY SMITH,

        Plaintiffs,

v.

THOMAS SULLIVAN, individually, and JORGE
AREVALO, individually,

        Defendants.

_____/

<u>**NOTICE OF FILING PLAINTIFFS' FIRST INTERROGATORIES
TO DEFENDANT THOMAS SULLIVAN**</u>

      Plaintiffs, 10295 COLLINS INVESTMENT, INC., NICHOLAOS ROKANAS,

PENELOPE LASKARIS, GARY DANIELS, CLAIRE DANIELS, 513 AMREI LLC, NAIM

FARHAT,KINDA FARHAT, HASSAN ABBASS, JULIA ABBASS, ASHOK KUMAR,

GEORGE J. SCHAFER, LLC, K & K REALTY ASSOCIATES, LLC, NORMAN GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC, BAL HARBOUR 1017, LLC, KU TRADING, LLC, LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC, EDWARD TAM, TARA HART, NOEL A DA SILVA, VIMAL M. FONSECA, DENIS TRUPKIN, LINDA TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC, MICHAEL A. MURR, 133812 CANADA, INC.,  FRANCIS LEO DOYLE III, SUN OBH, LLC, TAR OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC, UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714 REGENT BAL HARBOUR, LLC, SKY OBH, LLC, ROSSI REALTY GROUP, PAUL DALMAZIO, CHRISTINE DALMAZIO, S T BALHARBOUR, LLC, MICHAEL KONIG and RAY SMITH, (collectively, the "RMA Unit Owners"), by and through undersigned attorney, and pursuant to Rule 1.340 of the Florida Rules of Civil Procedure, notify the Court that they have served the original and one copy of their First Set of Interrogatories to the Defendant, THOMAS SULLIVAN.

**PARDO & GAINSBURG, PL**
Counsel for Plaintiffs
200 Southeast First Street, Suite 700
Miami, FL 33131
Phone: (305) 358-1001
Facsimile (305) 358-2001

By:_____
       Stevan J. Pardo
       Fla. Bar No. 438616

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing court papers was served via email on the 26th day of March, 2014, to: Eric Ostroff, Esq., Meland Russin Budwick, 3200 Southeast Financial Center, 200 South Biscayne Blvd., Miami, Florida 33131, eostroff@melandrussin.com.

By: _____
Stevan J. Pardo
Fla. Bar No. 438616

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 14-002716 CA 01

10295 COLLINS INVESTMENT, INC., NICHOLAOS
ROKANAS, PENELOPE LASKARIS, GARY DANIELS,
CLAIRE DANIELS, 513 AMREI LLC, NAIM FARHAT,
KINDA FARHAT, HASSAN ABBASS, JULIA
ABBASS, ASHOK KUMAR, GEORGE J. SCHAFER,
LLC, K & k REALTY ASSOCIATES, LLC, NORMAN
GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC,
BAL HARBOUR 1017, LLC, KU TRADING, LLC,
LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH
PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC,
EDWARD TAM, TARA HART, NOEL A DA SILVA,
VIMAL M. FONSECA, DENIS TRUPKIN, LINDA
TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC,
MICHAEL A. MURR, 133812 CANADA, INC.,
FRANCIS LEO DOYLE, III, SUN OBH, LLC, TAR
OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC,
UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714
REGENT BAL HARBOUR, LLC, SKY OBH, LLC,
ROSSI REALTY GROUP, PAUL DALMAZIO,
CHRISTINE DALMAZIO, S T BALHARBOUR, LLC,
MICHAEL KONIG and RAY SMITH,

       Plaintiffs,

v.

THOMAS SULLIVAN, individually, and JORGE
AREVALO, individually,

       Defendants.

_____/

### PLAINTIFFS' FIRST SET OF INTERROGATORIES
### TO DEFENDANT THOMAS SULLIVAN

    Plaintiffs, 10295 COLLINS INVESTMENT, INC., NICHOLAOS ROKANAS,

PENELOPE LASKARIS, GARY DANIELS, CLAIRE DANIELS, 513 AMREI LLC, NAIM

FARHAT, KINDA FARHAT, HASSAN ABBASS, JULIA ABBASS, ASHOK KUMAR,

GEORGE J. SCHAFER, LLC, K & K REALTY ASSOCIATES, LLC, NORMAN GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC, BAL HARBOUR 1017, LLC, KU TRADING, LLC, LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC, EDWARD TAM, TARA HART, NOEL A DA SILVA, VIMAL M. FONSECA, DENIS TRUPKIN, LINDA TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC, MICHAEL A. MURR, 133812 CANADA, INC.,  FRANCIS LEO DOYLE III, SUN OBH, LLC, TAR OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC, UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714 REGENT BAL HARBOUR, LLC, SKY OBH, LLC, ROSSI REALTY GROUP, PAUL DALMAZIO, CHRISTINE DALMAZIO, S T BALHARBOUR, LLC, MICHAEL KONIG and RAY SMITH, (collectively, the "RMA Unit Owners"), by and through its undersigned counsel, and pursuant to Rule 1.340, Florida Rule of Civil Procedure, propound the following set of interrogatories to be answered by Defendant, THOMAS SULLIVAN, and request that they be answered separately, fully and under oath within the time prescribed by law.

**PARDO & GAINSBURG, PL**
Counsel for Plaintiffs
200 Southeast First Street, Suite 700
Miami, FL 33131
Phone: (305) 358-1001
Facsimile: (305) 358-2001

By:_____
Stevan J. Pardo
Fla. Bar No. 438616

## DEFINITIONS AND INSTRUCTIONS

1.       "Person" means a natural Person, a group of natural Persons acting as individuals, a group of natural Persons acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, a partnership, a joint venture, a government or government agency and/or any other incorporated or unincorporated business, government or social entity or any other entity or group of natural Persons or such entities, singular or plural, male, female, or neuter gender, as the context may require.

2.       "Plaintiffs" means the RMA Hotel Unit Owners referenced in the style of this case, and/or any employees, agents, attorneys, representatives, or other individuals who work directly or indirectly on their behalf.

3.       "One Bal Harbour" or the "Property" means (i) that certain property located at 10295 Collins Avenue in Bal Harbour, Florida, more particularly described in the Tower Declaration as the "Hotel Lot," the "Spa Lot," and the "Restaurant Lot" (which include, without limitation, the certain amenities or portions of the Hotel Lot that were intended to serve, be enjoyed by, or exist for the benefit of the owner(s) of the Lots, the condominium units, and the guests of the hotel (the "Shared Facilities")), which Tower Declaration is recorded in Official records Book 25985 at Page 4506 of the Public Records of Miami-Dade County, Florida; (ii) all rights under the Plaza Easement Agreement recorded in Official Records Book 21982 at Page 4126 of the Public Records of Miami-Dade County, Florida and all amendments thereto; (iii) all rights under the Development Agreement and Declaration of Restrictive Covenants recorded in Official Records Book 21375 at Page 212 of the Public Records of Miami-Dade County, Florida and all amendments thereto (the Tower Declaration, Plaza Easement Agreement, and Development Agreement and Declaration of Restrictive Covenants being collectively referred to hereafter as the "One Bal Harbour Documents").

4.       "Complaint" refers to the pleading entitled Complaint filed in this action.

5.       "Elcom Hotel" refers to Elcom Hotel & Spa, LLC.

6.       "Elcom Condo" refers to Elcom Condominium, LLC.

7.       "Elevation" refers to Elevation Communities, LLC.

8.       "Communication" means any Communication which is between or among two (2) or more Persons, employees, representatives, or agents of a party.  A Communication includes any document which is recorded in a party's business records for internal or external corporate use irrespective of whether it is actually communicated to another individual.

9.       "Document" is used in its broadest sense under the Federal Rules of Civil Procedure and includes graphic matter of any kind or nature, whether written, printed, typed, recorded, filed, punched, transcribed, taped, or produced or reproduced by any means.  The term "document" includes, but is not limited to, all papers, books, contracts, licenses, inter-office communications, records, Personal notes, cablegrams, telexes, e-mails, electronic data, studies,

calendars, diaries, desk calendars, appointment books, agendas, minutes, pamphlets, envelopes, telephone messages, graphs, records of meetings, summaries or records of telephone conversations, voice mails, summaries of records of Personal conversations or interviews, employee notebooks, summaries of records of meetings or conferences, tabulations, analyses, evaluations, projections, work papers, charts, statements, summaries, journals, billing records, and invoices, and all communicative materials of any kind. The term "document" also includes every other means by which information is recorded or transmitted, including, but not limited to, photographs, videotapes, tape recordings, microfilms, punch cards, computer programs, printouts, all recordings made through data processing techniques, and the written information necessary to understand and use such materials. The term "documents" is further defined to mean the original, any drafts, and any non-identical copies (i.e., those bearing notations or marks not found on the original).

10.     "Hotel Owner" means Elcom Hotel, the owner of the Property, including the Hotel Lot.

11.     "RMAs" mean the rental management agreements between either the original Hotel Owner, WCI Communities, Inc. or Elcom Hotel and Plaintiffs.

12.     "Rental Income" means the rents or monies collected by the Hotel Owner from Hotel guests pursuant to the RMAs.

13.     "Hotel Operations" means activities involved in the day to day functions of running the business. Such Hotel Operations include, but are not limited to, daily management, hiring and supervision of employees, repairs, gathering and utilizing proprietary information, marketing, and generally converting materials and labor into goods and services as efficiently as possible in order to balances costs with revenues to maximize the profits.

14.     "Unit" means any individual unit or units in the Hotel Condominium Lot at One Bal Harbour.

15.     "Possession, custody, or control" means a document in your physical custody; or, that you own in whole or in part; or, have a right by contract, statute, or otherwise to use, inspect, examine or copy such document on any terms; or have an understanding, express or implied, that you may use, inspect, examine or copy such document on any terms; or you have, as a practical matter, the ability to use, inspect, examine or copy such document.

16.     The words "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information which might otherwise be construed as to be outside the scope of the request.

17.     "Any" shall be understood to include and encompass "all" and vice-versa.

18.     "Reflecting," "reflect," or any other derivative shall be construed as referring to, responding to, relating to, pertaining to, connected with, comprising, memorializing,

4.      Please provide all facts that support or tend to support each of Your denials in Your response to the Complaint.

A:

5.      Please Identify all witnesses who have knowledge that supports or tends to support any of Your affirmative defenses or denials as set forth in Your response to the Complaint. For each witness, please describe what facts that Person knows that supports or tends to support the particular affirmative defenses or denial.

A:

6.      Please explain, in full detail, all of Your duties and obligations as manager of Elevation.

A:

7.      Please explain, in full detail, all of Your duties and obligations as manager of Elcom Hotel.

A:

8.      Please explain, in full detail, all of Your duties and obligations as manager of Elcom Condo.

A:

9.      Please state, how often You met with Jorge Arevalo, as Your co-manager, in 2009, 2010, and 2011 concerning the finances, Hotel Operations, and Rental Income at the Property. Please be specific as to frequency of meetings and length of their duration, whether in-person or by phone or teleconference. Also include whether the meetings You describe involved discussion of the finances, Hotel Operations, and Rental Income at the Property or only a subset of those topics.

A:

10.    Please describe with particularity what information, including Documents, Jorge Arevalo provided to You in 2009, 2010, and 2011 Relating to the financial condition and Hotel Operations at the Property.  Please include in Your answer an explanation of Your requests to Jorge Arevalo for such information and Documents, including the dates of such requests.

A:


11.    Please state how often Sullivan's accountant or any of Sullivan's companies' accountants met with an Elcom representative in 2009, 2010, and 2011.  In Your answer, please Identify the accountant(s) who met with the Elcom representative(s) and Identify the Person with whom the accountant met, and describe the purpose of those meetings and what Documents were provided to the accountant(s) and to You as co-manager of the Property.

A:


12.    On what date did You first become aware that Elcom Hotel and/or Elcom Condo lacked the working capital to pay their bills as they became due.  Please include in Your answer a description of how you came to learn of the shortfall in working capital and any requests You made to Jorge Arevalo or Juan Arevalo for such information and Documents, including the dates of such requests.

A:


13.    On what date did You first become aware that Elcom Hotel was not remitting rental income to the RMA Owners pursuant to the RMAs.  Please include in Your answer a description of how You came to learn that Elcom Hotel was not remitting rental income and any requests You made to Jorge Arevalo or Juan Arevalo for such information and Documents, including the dates of such requests.

A:


14.    On what date did You first become aware of the financial condition of Elcom Hotel as of December 31, 2009.  Please include in Your answer a description of how You came to learn about Elcom Hotel's financial status in 2009 and any requests You made to Jorge Arevalo for such information and Documents, including the dates of such requests.

A:

15.  On what date did You first become aware of the financial condition of Elcom Hotel as of December 31, 2010. Please include in Your answer a description of including specific facts, on how You came to learn about Elcom Hotel's financial status in 2010 and any requests You made to Jorge Arevalo or Juan Arevalo for such information and Documents, including the dates of such requests.

A:

16.  On what date did You first become aware of the financial condition of Elcom Hotel as of December 31, 2011. Please include in Your answer a description, including specific facts, on how You came to learn about Elcom Hotel's financial status in 2011 and any requests You made to Jorge Arevalo or Juan Arevalo for such information and Documents, including the dates of such requests.

A:

17.  On what date did You first become aware of the bulk sale to One Bal Harbour Investment Properties, Inc. of 39 Elcom units in February 2011. Please include in Your answer what facts You knew on the date You state You first became aware of the bulk sale, and what inquiry You made (e.g. the questions You asked and documents You reviewed) and to whom You made such inquiry before the bulk sale transaction closed.

A:

18.  Please provide the dates and description with particularity of any and all requests, whether oral or written, from Jorge Arevalo or Juan Arevalo to You to provide monies to Elcom Hotel or Elcom Condo at any time after the date of Elcom's acquisition of the Property in June 2009.

A:

19.  Please describe with particularity what information, including Documents, Jorge Arevalo or Juan Arevalo provided to You Relating to any insurance policies, insuring agreements, or insurance financing agreements for One Bal Harbour and the payment of any insurance premiums or bills relating in any way to insurance or insurance financing for One Bal Harbour. Please include in Your answer an explanation of Your requests to Jorge Arevalo or Juan Arevalo for such information and Documents, including the dates of such requests.

A:

20.   Please explain, in detail, how You and Jorge Arevalo, as co-managers of the Property, determined the manner in which the Property would be capitalized, including provision of working capital, following Elcom's purchase of the Property in June 2009.   Please include in Your answer a detailed explanation of the date and content of all Communications, whether oral or in writing, between You and Jorge Arevalo Relating to the origin and amount of monies to be used to pay Hotel Operations, as opposed to the purchase of the Property.

A:

21.   Please explain, in detail, how You and Jorge Arevalo, as co-managers of the Property, allocated the expenses of the Property following Elcom's purchase of the Property in June 2009.   Please include in Your answer a detailed explanation of the date and content of all Communications, whether oral or in writing, between You and Jorge Arevalo Relating to how monies generated from Shared Facilities, assessments, and Rental Income would be allocated to pay for Hotel Operations, the rental income to the Hotel Condominium Unit Owners, and Shared Facilities including the restaurant, spa, valet, security, and grounds.

A:

22.   With regard to Your answer to question 21 above, please explain what specific steps You took to ensure that expenses were allocated as initially planned and why the allocation was not maintained?

A:

23.   Please explain, in detail, how You and Jorge Arevalo, as co-managers of the Property, ensured the escrow or separation of accounting for the Rental Income collected and the reserve requirements for the Rental Income.   Please include in Your answer a detailed explanation of the date and content of all Communications, whether oral or in writing, between You and Jorge Arevalo Relating to the provision of separate accounting for the Rental Income collected and the reserve.

A:

24.    With regard to Your answer to question 23 above, please explain what specific steps You and Jorge Arevalo took to establish such escrow or separation of accounting for the Rental Income and the reserve requirements and Your follow-up efforts to ensure such provisions were in fact executed.

A:

State of Florida            :
County of Miami-Dade        :

BEFORE ME, the undersigned THOMAS SULLIVAN authority, personally appeared _____ who, after being first duly sworn, deposes and says that he is the _____ has read the following answers to Interrogatories and the Answers are true and correct.

SWORN AND SUBSCRIBED before me this ___ day of _____, 2014

_____
Signature of Notary Public


_____
Notary Public, State of
Commission No.
My commission expires:

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO. 14-002716 CA 01

10295 COLLINS INVESTMENT, INC., NICHOLAOS
ROKANAS, PENELOPE LASKARIS, GARY DANIELS,
CLAIRE DANIELS, 513 AMREI LLC, NAIM FARHAT,
KINDA FARHAT, HASSAN ABBASS, JULIA
ABBASS, ASHOK KUMAR, GEORGE J. SCHAFER,
LLC, K & k REALTY ASSOCIATES, LLC, NORMAN
GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC,
BAL HARBOUR 1017, LLC, KU TRADING, LLC,
LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH
PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC,
EDWARD TAM, TARA HART, NOEL A DA SILVA,
VIMAL M. FONSECA, DENIS TRUPKIN, LINDA
TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC,
MICHAEL A. MURR, 133812 CANADA, INC.,
FRANCIS LEO DOYLE, III, SUN OBH, LLC, TAR
OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC,
UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714
REGENT BAL HARBOUR, LLC, SKY OBH, LLC,
ROSSI REALTY GROUP, PAUL DALMAZIO,
CHRISTINE DALMAZIO, S T BALHARBOUR, LLC,
MICHAEL KONIG and RAY SMITH,

        Plaintiffs,

v.

THOMAS SULLIVAN, individually, and JORGE
AREVALO, individually,

        Defendants.

_____/

**PLAINTIFFS' AND DEFENDANT AREVALO'S AGREED ORDER
ESTABLISHING SERVICE AND EXTENDING TIME TO RESPOND TO
COMPLAINT**

Plaintiffs, 10295 COLLINS INVESTMENT, INC., NICHOLAOS ROKANAS,

PENELOPE LASKARIS, GARY DANIELS,CLAIRE DANIELS, 513 AMREI LLC, NAIM

FARHAT,KINDA FARHAT, HASSAN ABBASS, JULIA ABBASS, ASHOK KUMAR,

GEORGE J. SCHAFER, LLC, K & K REALTY ASSOCIATES, LLC, NORMAN GLOWINSKY, LILIAN GLOWINSKY, JOSEMAR, LLC, BAL HARBOUR 1017, LLC, KU TRADING, LLC, LEWIS SCHENKER, ARLINE SCHENKER, JOSEPH PUGLISI, PATRICIA PUGLISI, TAS PROP, LLC, EDWARD TAM, TARA HART, NOEL A DA SILVA, VIMAL M. FONSECA, DENIS TRUPKIN, LINDA TRUPKIN, INDULGENCE AT BAL HALBOUR, LLC, MICHAEL A. MURR, 133812 CANADA, INC.,  FRANCIS LEO DOYLE III, SUN OBH, LLC, TAR OBH, LLC, UNIT# 1113 REGENT BAL HARBOUR, LLC, UNIT 1112 REGENT BAL HARBOUR, LLC, UNIT# 714 REGENT BAL HARBOUR, LLC, SKY OBH, LLC, ROSSI REALTY GROUP, PAUL DALMAZIO, CHRISTINE DALMAZIO, S T BALHARBOUR, LLC, MICHAEL KONIG and RAY SMITH, (collectively, the "RMA Unit Owners"), and Defendant, JORGE AREVALO, submit this Agreed Order establishing the date of service and extending the time for Defendant AREVALO to respond to the Complaint, as follows:

This cause having come before the Court on Plaintiffs RMA UNIT OWNERS' and Defendant AREVALO's Agreement regarding AREVALO's acceptance of service of the Complaint and an extension of his time to respond to the Complaint, and the Court, having reviewed the file being otherwise fully advised in the premises, it is

ORDERED and ADJUDGED as follows:

1.  Defendant AREVALO's counsel has agreed to accept service of the Complaint on Defendant AREVALO's behalf.  Service will be deemed to have occurred on April 7, 2014.

2.  Defendant AREVALO shall have 40 days to respond to the Complaint.  The response shall be due May 19, 2014.

3.    No discovery shall take place in the case as to AREVALO until after May 19, 2014. Furthermore, no deposition of any person or party shall be set to take place until after May 19, 2014.

4.    Discovery requests already served upon Defendant SULLIVAN shall be copied to Defendant AREVALO's counsel.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 04/09/14.

BETH BLOOM
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

cc:    Stevan J. Pardo, Esq.
       Joseph A. DeMaria, Esq.

3